**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

---

No. 97-30056

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

VICTOR G. KELLEY; WELTON L. WRIGHT; TERRY ELMORE;
JAMES EARL SHAW; PARNELL KELLEY aka P.K.,

Defendants-Appellants.

---

Appeals from the United States District Court
for the Western District of Louisiana

---

April 29, 1998

Before REYNALDO G. GARZA, DUHÉ, and STEWART, Circuit Judges.

STEWART, Circuit Judge:

On September 28, 1995, Victor G. Kelley, Welton L. Wright, Terry Elmore, James Earl Shaw, Larry Doublin, and Parnell Kelley, aka P.K., were arrested pursuant to a 13-count indictment alleging a drug conspiracy, forfeiture, and various drug distribution crimes that spanned from sometime in 1993 through May 1995. The distribution charges against Victor Kelley, the purported leader of the conspiracy, were dropped prior to trial. Victor Kelley's girlfriend—Angela Turner—was also named in the indictment, but her charge was limited to a structuring offense. Following a three-week jury t rial, the defendants were found guilty on all counts of the indictment and convicted as charged. Victor Kelley, Welton Wright, Terry Elmore, James Shaw, and Parnell Kelley timely appeal such convictions and sentences.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

The appellants, each in their twenties (except Wright), all resided in Monroe, Louisiana, and apparently grew up in the same neighborhood or have known each other for quite some time. All of the appellants—and all of the defendants below—are African-American. The government alleges that they orchestrated a rather large, almost impenetrable drug distribution ring in northeast Louisiana—its leader being Victor Kelley, its supervisor being Wright, and its "headquarters" being Wright's home as that is where appellants' often gathered to cook the powder cocaine into crack cocaine. The government asserts that the cocaine was imported by Victor Kelley from Houston, Las Vegas, and California.

The charges stem from transactions entered into between various appellants and Daniel Townes, a confidential informant ("CI"), and Tamara Andrews, an undercover agent ("UCA") who posed as Townes' girlfriend. Townes, an unindicted co-conspirator in this action, reported that he had previously been involved in selling drugs with these men and subsequently was used to provide investigators access to the organization. Both Townes and Andrews were wired with eavesdropping devices during these transactions. The government also wiretapped Wright's telephone for a one-month period in 1994 and intercepted numerous drug-related phone calls. During the course of the investigation, officers became aware that Angela Turner had purchased the property in which she resided with Victor Kelley and two of his children with $60,000 in bank money orders which she had obtained with the names of various individuals on them. Investigators obtained a search warrant for the home in order to seize bank records and/or financial documents related to the purchase. During the search, officers found a notebook appearing to be a drug ledger which they seized. That seizure, conducted pursuant to an unsigned search warrant, was the subject of one of the defendants' motions to suppress.

The government's presentation at trial consisted principally of the following: (1) the testimony of CI Townes pertaining to his concededly "limited" penetration of the drug ring; (2) the testimony of CI Townes and UCA Andrews pertaining to (and wiretap and eavesdropping surveillance evidence

gathered from) the drug distribution transactions;[1] (3) surveillance evidence secured via a wiretap of Wright's home telephone;[2] and (4) certain evidence (*i.e.*, cash and a page from a notebook purported to be a drug ledger) seized from Victor Kelley's and Turner's home pursuant to an unsigned and undated warrant.

In response, appellants sought suppression of the wiretap evidence and the drug ledger page, on the grounds that the government's affidavit in support of the wiretap was deficient and the warrant authorizing the search of Kelley's home was invalid. Both motions were ultimately denied. As to the drug ledger, the magistrate judge initially suppressed it because its seizure exceeded the scope of the warrant. The district court disagreed with the magistrate judge's reasoning, finding that seizure of the drug ledger did not exceed the scope of the warrant because it appeared in plain view among the documents and papers that were authorized to be searched. Nevertheless, the district court initially decided to suppress the ledger because the warrant was unsigned and undated. After considering the government's motion to reconsider, however, the district court determined that the good-faith exception to the exclusionary rule was applicable, and allowed the drug ledger page into evidence.

During jury selection at trial, defendants used their fourteen peremptory strikes to strike only white jurors. The government challenged defendants' strikes as racially motivated. The defendants then challenged the government's use of six of its ten strikes to strike African-Americans. Three African-Americans remained on the jury. The district judge found that both the government and the defendants had made a prima facie showing of racially-motivated peremptory strikes and required that both sides proffer reasons for their strikes. The court disbelieved defendants with respect to the motivation for four of their strikes and three of those jurors survived on the jury. The court accepted

---

[1]These transactions occurred over a period from the end of June, 1994 through the end of October, 1994. In early October, one of Wright's associates recognized Andrews as an undercover agent. All subsequent attempts to engage appellants in drug transactions (except one by Townes alone) were unsuccessful.

[2]The wiretap was effective from November 7, 1994 to December 7, 1994.

all of the government's reasons as race-neutral and valid.

Following the trial, Victor Kelley was convicted of conspiracy to distribute crack cocaine. All other defendants were convicted as charged. The district court sentenced the defendants based on guideline calculations using the entire amount of drugs testified to at trial as the amount distributed by the entire conspiracy. The defendants timely appeal their convictions.

## ANALYSIS

## I

## The Unsigned and Undated Search Warrant

*Standard of Review*

When reviewing the denial of a motion to suppress, we review factual findings for clear error and review the trial court's ultimate conclusion as to the constitutionality of law enforcement action de novo. United States v. Castro, 129 F.3d 752, 755 (5th Cir. 1997). Conclusions of law regarding the sufficiency of a warrant are reviewed de novo. United States v. Shugart, 117 F.3d 838, 843 (5th Cir. 1997). Likewise, the district court's determination of the reasonableness of a law enforcement officer's reliance upon a warrant issued by a magistrate—for purposes of determining the applicability of the good-faith exception to the exclusionary rule— is also reviewed de novo. United States v. Satterwhite, 980 F.2d 317, 320 (5th Cir. 1992).

*Discussion*

Victor Kelley and Welton Wright argue that the district court erred in failing to suppress evidence found during the search of Victor Kelley and Angela Turner's premises because the warrant used to authorize the search was not signed or dated by the issuing magistrate judge. The appellants contend that the magistrate's failure to sign the search warrant was critical to the validity of the warrant and that no search pursuant to such a warrant could be a good-faith search. The appellants maintain that the district court erred in denying their motion to suppress the drug ledger and that the

4

good-faith exception to the exclusionary rule should not be applicable to this case.[3] They further argue that the items seized—in particular, a drug ledger page—exceeded the scope of the purported warrant. In its motion to reconsider filed in the district court, the government urged the court to apply the good-faith exception to the exclusionary rule. The government submitted three affidavits in support of the executing officers' reasonable presumption of the warrant's validity.[4]

The Fourth Amendment's exclusionary rule does not bar the admission of evidence obtained with a warrant later found to be invalid so long as the executing officers acted in reasonable reliance on the warrant. United States v. Leon, 468 U.S. 897, 906-08, 104 S.Ct. 3405, 3411-12, 82 L.Ed.2d 677 (1984). Generally, "[i]ssuance of a warrant by a magistrate suffices to establish good faith on the part of law enforcement officers who conduct a search pursuant to the warrant." Id. at 922-23. However, the Court in Leon made clear that an officer's reliance on the technical sufficiency of the warrant not only must be made in good faith, but also must be objectively reasonable. The Leon Court noted that in some circumstances the officer will have no reasonable grounds for believing that

---

[3]We note that ordinarily, Wright would lack the requisite standing to bring this claim. Ordinarily, there is no standing to contest a search and seizure when the defendant is not on the premises at the time of the contested search and seizure; he alleges no proprietary or possessory interest in the premises; and he is not charged with an offense that includes as an essential element thereof the possession of seized evidence at the time of the contested search and seizure. Brown v. United States, 411 U.S. 223, 229 (1973); see also United States v. Krout, 66 F.3d 1420, 1430-31 (5th Cir. 1995) ("In general, a person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed."). Nonetheless,
by failing to contest this issue either before the district court or this panel, the government has waived its standing argument with respect to Wright. See United States v. Cardona, 955 F.2d 976, 981 (5th Cir. 1992) (citing Steagald v. United States, 451 U.S. 204, 208-11, 101 S.Ct. 1642, 1645-47, 68 L.Ed.2d 38 (1981)).

[4]The affidavits are taken from I.R.S. Special Agent Kenneth Swanner (the law enforcement officer who sought the warrant), I.R.S. Special Agent Mike Epps, and Magistrate Judge John W. Wilson. In these affidavits, it is represented that: (1) Swanner and Epps presented the magistrate with an application for a search warrant, an affidavit in support of the warrant, and the search warrant itself; (2) the magistrate read the documents, asked questions about the documents, commented upon the facts contained therein, and determined that probable cause did, in fact, exist; (3) the magistrate signed the application for a search warrant and inadvertently dated it October 26, 1995 (the actual date was September 26, 1995); (4) the magistrate inadvertently forgot to sign and date the search warrant itself; and (5) the magistrate answered affirmatively when asked by Swanner whether all the necessary steps for securing the warrant had been taken.

a warrant is valid—*e.g.*, when the warrant is facially deficient in particularizing the place to be searched or the things to be seized.[5] Id. at 923. On this basis, Victor Kelley and Wright argue that the unsigned and undated warrant in this case was facially deficient such that the officers could not have relied on it in an objectively reasonable way. We disagree with Kelley and Wright's reasoning.

In Massachusetts v. Sheppard, 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984), the Supreme Court considered a defendant's argument that a warrant authorizing a search for "controlled substances" violated the Fourth Amendment's particularity requirement.[6] Id. at 987, 104 S.Ct. at 3427. A detailed affidavit accompanying the challenged warrant indicated that the search was for items related to a homicide investigation. Id. at 985, 104 S.Ct. at 3426. It was undisputed that the issuing magistrate and the executing officers knew the contents of the affidavit and the focus of the search. Relying on Leon, the Court noted that the only issue before it was "whether the officers reasonably believed that the search they conducted was authorized by a valid warrant." Id. at 988, 104 S.Ct. at 3427. The Court concluded that the officers' good-faith reliance on the warrant was objectively reasonable because the affidavit had been approved by the U.S. Attorney, the issuing magistrate had made a probable cause determination, and the warrant would have been valid on its face with only minor corrections. Id. at 989, 104 S.Ct. at 3428.

Likewise, in United States v. Beaumont, 972 F.2d 553, 562 (5th Cir. 1992), we applied the good-faith exception to uphold the admissibility of evidence seized during a search, despite the fact that the warrant authorizing the search failed the particularity requirement. Relying on the Supreme Court's instruction as well as this circuit's subsequent analysis, we concluded that the officers'

---

[5]The instant case involves an officer's reliance on a warrant that was technically insufficient, *i.e.*, one without a signature or a date. In Leon, the Court was confronted with an officer's reliance on a warrant that did not support the magistrate judge's probable-cause determination. The Court found the good-faith exception to the exclusionary rule to be applicable because the officers were not "dishonest or reckless in preparing their affidavit" and (based on the facts of the case) "could have harbored an objectively reasonable belief in the existence of probable cause." In the instant case, it is undisputed that probable cause to search Kelley's home existed. Therefore, Leon, although it provides the starting point for our analysis, is factually distinguishable from the instant matter.

[6]A warrant that does not satisfy the particularity requirement is akin to a warrant that is unsigned and undated. Both violations are technical in nature.

good-faith reliance on the warrant was objectively reasonable because "there was a probable cause determination made by [a] judge, the affidavit provided specific information of the objects of the search, the executing officer was the affiant, the additional officers making the search knew what was to be searched for, and, finally, the warrant could easily have been made valid with the insertion of the phrase 'see attached affidavit.' " United States v. Shugart, 117 F.3d 838, 845-46 (5th Cir. 1997) (offering an analysis of both Sheppard and Beaumont).

Guided once again by the Supreme Court's Sheppard analysis, we find that the evidence in the instant case was properly admitted because the police conduct was objectively reasonable and largely error-free, and that it was the judge and not the police officers who made the mistake. See Sheppard, 468 U.S. at 990-91, 104 S.Ct. at 3428-29. Further, we find that the officers in this case took every step that could reasonably be expected of them. On this point, the words of the Sheppard Court are again instructive: "we refuse to rule that an officer is required to disbelieve a judge who has just advised him, by word and by action, that the warrant he possesses authorizes him to conduct the search he has requested." Id. at 989-90, 104 S.Ct. at 3428-29. In this specific circumstance—albeit a narrow one—we find that the meaning behind the function of dating and signing the warrant was not lost. Because the objective criteria for the search warrant—probable cause—existed and the warrant was flawed only due to the inadvertence of the magistrate, we hold that the good-faith exception to the exclusionary rule applies.

In reaching our determination that the good-faith exception to the exclusionary rule applies in this instance, we in no way intend to undercut the importance of both the substantive and ministerial requirements of the Fourth Amendment. We heed the wisdom of the Supreme Court when it advised that:

> The good-faith exception for searches conducted pursuant to warrants is not intended to signal our unwillingness strictly to enforce the requirements of the Fourth Amendment, and we do not believe that it will have this effect. As we have already suggested, the good-faith exception, turning as it does on objective reasonableness, should not be difficult to apply in practice. When officers have acted pursuant to a warrant, the prosecution should ordinarily be able to establish objective good faith without a substantial expenditure of judicial time.

7

> Anderson v. Creighton, 483 U.S. 635, 663 n. 19, 107 S.Ct. 3034, 3051 n. 19 (1987) (quoting United States v. Leon, 468 U.S. 897, 924, 104 S.Ct. 3405, 3421, 82 L.Ed.2d 677 (1984)).

We further note that our holding today does not eviscerate the requirement of case-by-case evaluation of the application of the exclusionary rule recognized by the courts. As the Ninth Circuit stated, "the 'policies behind the exclusionary rule are not absolute and must be evaluated realistically and pragmatically on a case-by-case basis.' " United States v. Luk, 859 F.2d 667, 671 (9th Cir. 1988) (quoting United States v. Vasser, 648 F.2d 507 at 510 n. 2 (9th Cir.1980), cert. denied, 450 U.S. 928, 101 S.Ct. 1385, 67 L.Ed.2d 360 (1981)); see, e.g., Leon, 468 U.S. at 906-07, 104 S.Ct. at 3411-12 (explaining that exclusionary rule is judge-made, not constitutional, and application of suppression sanction must be evaluated in each case).

Kelley and Wright also argue for a per se rule that an unsigned and undated warrant can never suffice, and that any evidence seized pursuant thereto must be suppressed. This court's reasoning in United States v. Richardson, 943 F.2d 547 (5th Cir. 1991) is helpful to us in disposing of this argument. In Richardson, despite constitutional infirmity and a technical violation of a criminal rule arising from the magistrate judge's failure to administer the proper oath or affirmation to an attorney before the attorney provided information supporting the warrant, we identified several reasons, equally applicable here, why suppression was unwarranted:

> First, '[p]enalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations.' Leon at 921. The rare occasion when a magistrate accidentally fails to [sign a warrant] cannot be eliminated by suppressing the evidence in that situation. Second, it is unlikely that police will willfully and recklessly attempt to evade [getting a warrant signed]. . . . Third, suppressing the evidence seized in the case will add nothing to protect against an affiant who misrepresents the facts to the magistrate, nor will it encourage officers to take their chances in submitting deliberately or recklessly false information . . . . Richardson, 943 F.2d at 550.

Because suppression in this situation would not serve a deterrent purpose, and because probable cause existed and the application for the warrant was signed, we conclude that the district court did not err by failing to apply the exclusionary rule.

**Sufficiency of Affidavit Supporting the Wiretap**

*Standard of Review*

We review for clear error the district court's decision with respect to a motion to suppress recorded conversations because of deficiencies in an affidavit offered in support of the wiretap authorization. United States v. Tomblin, 46 F.3d 1369, 1376 (5th Cir. 1995).

*Discussion*

Appellants Victor Kelley, Wright, Elmore and Shaw, asserting a violation of their Fourth Amendment rights, claim that the affidavit upon which the court based its authorization of the wiretap on Wright's phone was insufficient. Specifically, they urge that the supporting affidavit (1) did not properly establish that other investigative techniques were sufficiently exhausted as required by 18 U.S.C. § 2518(1)(c); and (2) contained false statements and misrepresentations that physical surveillance would have been insufficient and would have alerted appellants to the investigation and that CI Townes existed only on the "fringe" of the drug ring.[7]

Appellants claim that the wiretap affidavit's representation that other investigative techniques were exhausted and that physical surveillance would be insufficient and destructive to the government's case is belied by the government's assessment that the drug ring was "large"—so "large" in fact that it was responsible for the transportation of roughly 13 to 15 kilograms of cocaine into Monroe (from Houston and Las Vegas) via "female couriers, . . . interstate bus lines, various . . . transport vehicles, and commercial airlines." Appellants suggest that the government "took the easy way out," as is evident by the fact that the only significant physical evidence presented by the

---

[7]Because each of the above-named appellants participated in the complained-of intercepted communications, they meet our standing requirements as articulated in United States v. Scasino, 513 F.2d 47 (5th Cir. 1975). In Scasino, we interpreted 18 U.S.C. § 2510(11), which provides that an "aggrieved person" may move to suppress the contents of an unlawfully intercepted communication. We held that only "one who participated in the intercepted conversation or on whose premises the conversation occurred" had standing to challenge the fruits of an illegal wiretap. Id. at 50. Our holding was based on the Supreme Court's ruling in Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1968), that the wiretap statute incorporated existing Fourth Amendment standing principles.

government in this case consisted of purported drug transactions between appellants and CI Townes and UCA Andrews. Appellants also contend that the affidavit's assertion that CI Townes was only on the "fringe" of the operation is belied by the fact that CI Townes was a significant part of many of the counts in the indictment.

The government responds that appellants' allegations are conclusory and offer no proof of deliberate falsehood on its part, and that the record indicates that it sufficiently explained to the district court why normal surveillance techniques were impossible in this case. The government claims that surveillance problems arose because of the nature of appellants' neighborhood and the fact that they dealt only with persons they knew well and trusted. The government noted that although it was aware that (a) vast quantities of cocaine were coming into Monroe from Houston, Las Vegas, and California and (b) that Kelley's organization was the importer, it (the government) was never able to determine the source and volume of the trade because the organization was almost impenetrable, nor could it engage Kelley himself in any transactions. In sum, the government suggests that the wiretap was a last resort after CI Townes had been discredited by appellants. As for CI Townes, the government claims that the indictment itself is evidence that he was only on the "fringe" of this drug ring, as most of the charges contained therein reference small transactions executed by various appellants and CI Townes. Indeed, the government claims that had Townes been able to engage Victor Kelley in any drug transactions, or had he been able to penetrate the inner circle of the organization in any other way, the charges alleged in the indictment would have reflected this.

We find the government's arguments persuasive. Title 18 U.S.C. § 2518(1)(c) requires a showing that "in the particular investigation normal investigative techniques employing a normal amount of resources have failed to make the case within a reasonable period of time." United States v. Krout, 66 F.3d 1420, 1424-25 (5th Cir. 1995) (internal quotation omitted). The government is not required to prove exhaustion of every conceivable option before a wiretap order can be issued, and a common sense view of statements contained in the application is taken to determine if the statutory "necessity" requirement is satisfied. United States v. Guerra-Marez, 928 F.2d 665, 669 (5th Cir.

10

1991), cert. denied 502 U.S. 917 (1991). In Guerra-Marez, faced with circumstances similar to those in the instant case, we upheld an affidavit against § 2518(1)(c) attack and found no deliberate misrepresentations on the part of the government. The court recognized that:

> [T]he government was aware that [the CI's] status as a paid informant would subject her to impeachment, and it was entitled to secure evidence to corroborate the testimony of such a pivotal witness. Although other investigative techniques had been employed, gaps in the government's case were evident. For example, the quantity of heroin obtained through undercover drug buys was too small to prove a large-scale conspiracy. Some members of the ring became conscious of surveillance, frequently eluding the agents or refusing to deal with them. The agents' efforts to identify . . . suppliers were also frustrated by their inability to obtain advance warning of major incoming shipments of drugs. Although [the CI] occasionally witnessed large heroin transactions, such viewings were accidental and uncorroborated. The government could have reasonably concluded that attempting to elicit further information through [the CI] would have aroused the suspicions of other participants, thus endangering both its informant and the investigation.

Id. at 671; see also Krout, 66 F.3d at 1424. Likewise, in the instant case, the government was aware that Townes, as a paid informant, would be subject to impeachment at trial. Although Townes was able to engage a few appellants in drug transactions, evidence of a large-scale conspiracy seemed to be eluding the government. Moreover, further attempts by Townes to elicit information were made impossible by the appellants' aroused suspicions. In such circumstances, the issuance of a wiretap was justified. Therefore, due to the similarities between the instant case and the Guerra-Marez and Krout cases, and given our stringent standard, we conclude that the district court did not err in denying appellants' motion to suppress the wiretap evidence.

## III

### Batson Challenges

*Standard of Review*

Because jury selection is subjective, a determination pursuant to Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) turns largely on the court's evaluation of the credibility of counsel's explanation. United States v. Perkins, 105 F.3d 976, 978 (5th Cir. 1997) (citation omitted). Consequently, the district court's decision on the ultimate question of

11

discriminatory intent is a finding of fact which is accorded great deference. Id.

*Discussion*

Appellants Victor Kelley, Wright, Elmore and Shaw appeal the district court's decision to sustain three of the government's Batson challenges to their use of peremptory strikes against white jurors.[8] They allege that the defense articulated reasonable, race-neutral reasons for striking these jurors, and that the government did not prove purposeful discrimination. These appellants also appeal the district court's decision to deny four of their Batson challenges to the government's use of peremptory strikes against African-American jurors.[9] They insist that the government did not articulate reasonable race-neutral reasons for striking these jurors, and that they proved purposeful discrimination on the government's part. See United States v. Bentley-Smith, 2 F.3d 1368, 1373 (5th Cir. 1993) (setting forth three-step process for resolving Batson challenges).

Having reviewed the record, we find no error in the trial court's ruling with respect to either its decision to sustain the government's challenges to the defense's use of peremptory strikes or to deny the defense's challenges to the government's use of strikes. The Bentley-Smith court noted that:

> The district court's determination that a party has used peremptory strikes in a discriminatory manner is a finding of fact and thus cannot be overturned by this Court absent clear error. Hernandez v. New York, -- U.S. --, --, 111 S.Ct.1859, 1871, 114 L.Ed.2d 395 (1991). The district court's determination is entitled to great deference, since findings in this context largely turn on an evaluation of the credibility or demeanor of the attorney who exercises the challenge. Id. at 1372-

---

[8]The district court sustained the government's Batson challenges to the striking of jurors Pipes, Moore, and Blackwelder. The appellants wanted to strike juror Pipes because he had been in the Marine Corps and his demeanor indicated that he would be pro-prosecution; juror Moore because she was not sufficiently interested in the proceeding (due to her "preoccupation" with a wedding she had to attend during one of the weekends of the trial); and juror Blackwelder because he (a) did not appear to be fair and impartial and (b) he knew another potential juror.

[9]Alleging that the following reasons were race-neutral, the government struck: (1) juror Jones because she glared at the prosecution and attempted to read their notes; (2) juror Rambo because she suffered from a nervous condition and sat in the back row with her head in her hands; (3) juror Echols because she was working at Wal-Mart and would suffer a financial burden if called to serve (as her husband was unemployed); and (4) juror Kelly because she was a young mother who lived with her parents and had the last name "Kelly."

73.

The record in this case does not support the contention that the district court committed reversible error. The district court's finding that defendants' strikes presented a prima facie case of racial discrimination was not clearly erroneous. In response to a <u>Batson</u> challenge, "all that a prosecutor need offer is a facially valid explanation." <u>United States v. Krout</u>, 66 F.3d 1420, 1428 (5th Cir. 1995) (citing <u>Purkett v. Elem</u>, 514 U.S. 765, 767-68, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995)). "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." <u>Krout</u>, 66 F.3d at 1429 (internal quotation and citation omitted). "Accordingly, a 'legitimate reason' is not a reason that makes sense, but a reason that does not deny equal protection." <u>Id</u>. In the instant case, the prosecutor articulated specific conduct on the part of the potential jurors which the district court found legitimate. We do not intend to disturb such a finding.

## IV

## Sufficiency of the Evidence

*Standard of Review*

To convict each of the appellants of drug conspiracy, the government must prove the existence of an agreement to violate the narcotics laws, the appellant's knowledge of the agreement, and the appellant's voluntary participation in the agreement. <u>United States v. Gonzalez</u>, 76 F.3d 1339, 1346 (5th Cir. 1996). A jury may infer the elements of a conspiracy conviction from circumstantial evidence: "An agreement to violate narcotics laws may be inferred from concert of action." <u>United States v. Cardenas</u>, 9 F.3d 1139 (5th Cir. 1993). "Knowledge of the conspiracy may be inferred from a collection of circumstances." <u>Id.</u> In evaluating a sufficiency of the evidence claim, we must view the evidence and the inferences therefrom in the light most favorable to the jury's verdict and determine whether a rational trier of fact could have found these defendants guilty beyond a reasonable doubt. In addition, "determining the weight and credibility of the evidence is within the sole province of the jury." <u>United States v. Garza</u>, 990 F.2d 171, 173 (5th Cir. 1993). We "will not

13

supplant the jury's determination of credibility with that of [our] own." Id.

*Discussion*

Each of the appellants argues that there was insufficient evidence to support the jury's determination that he was a member of a drug conspiracy. In addition, appellants Wright, Elmore, Shaw, and Parnell Kelley argue that there was insufficient evidence to support their drug distribution convictions.

Appellants Wright, Elmore, and Shaw concede that undercover agent Andrews' testimony established that they were involved in several drug transactions. The jury is entitled to believe a witness unless the testimony is so incredible that it defies physical laws. United States v. Lerma, 657 F.2d 786, 789 (5th Cir. 1981), cert. denied, 455 U.S. 921 (1982). As the jury was within its province to credit her testimony, appellants' sufficiency arguments with respect to the drug distribution charges must fail.

Turning to the conspiracy convictions, each appellant asserts as the primary basis for the insufficiency of evidence the claimed lack of credibility of CI Townes. Specifically the appellants assert that his testimony was patently unbelievable and incredible because of his: (1) considerable prior criminal history; (2) status as a paid informant; (3) continued drug activity while operating as a CI; and (4) inconsistent testimony pertaining to (a) his motivation for becoming a CI and (b) his marital status and support of his children. In addition, appellants assert that (1) none of the wiretap evidence was of an incriminating nature and (2) the evidence seized from Victor Kelley's home (the drug ledger page and cash) was not sufficiently connected to them primarily because the government's experts could not verify that Victor Kelley's handwriting appeared on the drug ledger.

Appellants' argument with respect to the "patently unbelievable" nature of CI Townes' testimony is easily rejected. We have previously held that "a guilty verdict may be sustained if supported only by the uncorroborated testimony of a coconspirator, even if the witness is interested due to a plea bargain or promise of leniency, unless the testimony is incredible or insubstantial on its face." United States v. Bermea, 30 F.3d 1539, 1552 (5th Cir.1994), cert. denied, 514 U.S. 1097

14

(1995). "Testimony is incredible as a matter of law only if it relates to facts that the witness could not possibly have observed or to events which could not have occurred under the laws of nature." Id. Although Townes was not a coconspirator, there is no contention by appellants that Townes could not have observed the events he testified to, or that such observation was impossible. As the jury was within its province to credit Townes' testimony concerning the conspiracy charges despite his shortcomings, and his testimony regarding the distribution charges was corroborated by that of undercover agents, appellants' argument against Townes' testimony is meritless.

We are not persuaded by appellants' contention that the wiretap evidence and the evidence seized from Victor Kelley's home were not connected to them. Our review of the record reveals that the wiretap evidence and corroborating testimony of agents indicate that appellants were involved in numerous drug transactions. This evidence fully supports the jury's conclusion that the defendants engaged in a drug distribution conspiracy.

Parnell Kelley alleges that Townes' testimony did not established that he was a member of a conspiracy or that he participated in distribution transactions. We are unpersuaded by this argument. Our examination of the record reveals that the testimony of the undercover agents supports Parnell Kelley's conviction.

## V

### Outside Influence on the Jury

*Standard of Review*

We review for abuse of discretion the district court's denial of a motion for new trial alleging extrinsic influence on the jury. United States v. Jobe, 101 F.3d 1046, 1058 (5th Cir. 1996). In addition, we acknowledge that "[t]he procedures used to investigate allegations of juror misconduct and the decision as to whether to hold an evidentiary hearing are matters which rest solely within the sound discretion of the district court." Id. (citations omitted).

*Discussion*

Each of the appellants in this case argues that the district court abused its discretion in denying

15

his motion for mistrial, filed after the jury informed the judge that it was hesitant to render a verdict because certain of its members were afraid for their own safety, as well as that of their families. Appellants claim not only that this note evidenced an extrinsic influence on the jury, but that an extrinsic factor—fear itself—was driving their deliberations.

In any trial, there is an initial presumption that the jury is impartial. Jobe, 101 F.3d at 1058. As appellants point out, however, this presumption can be defeated through evidence that an extrinsic factual matter actually tainted the jury's deliberations. Id. Indeed, once such a showing is made, the defendant enjoys a rebuttable presumption of prejudice—entitling him to a new trial—unless the government proves the harmlessness of the breach.[10] The district court's investigation of these matters, however, is premised on a colorable showing that an extrinsic influence was actually made on the jury. Id. (explaining that a "district court must investigate the asserted impropriety, [and if the results of its inquiry so warrant, grant a new trial], only when a colorable showing of extrinsic influence is made."). Such a showing may be made by *evidence* that extrinsic factual matter tainted the jury's deliberations. United States v. O'Keefe, 722 F.2d 1175, 1179 (5th Cir. 1989).

Appellants did not present any evidence to indicate that an outside or extrinsic influence affected the jury. As the government points out, their claims are based on mere speculation. Appellant Elmore's brief states that "[t]his jury fear *had to be created* by a factor outside the confines of the evidence presented at trial for nothing in the record fosters such unusual fear." (emphasis added). Moreover, the government notes that defense counsel's cross-examination of CI Townes—during which Townes stated that he was fearful for his life—was the probable reason for the jury's fear. The government's explanation is certainly plausible. Given the stringent standard that governs our review, and because that there is no evidence of outside influence, we affirm the denial of appellants' motions.

## VI

_____

[10]In determining whether the government carries its burden on the harmlessness issue, the district court is obliged to consider "the content of the extrinsic material, the manner in which it came to the jury's attention, and the weight of the evidence against the defendant." Id. (citation omitted).

**Sentencing Claims**

*Standard of Review*

While the district court's interpretation of the Sentencing Guidelines is a question of law reviewed de novo, its factual findings under the Guidelines are reviewed only for clear error. United States v. Reyna, 130 F.3d 104, 112 (5th Cir. 1997). The district court's calculation of the amount of drugs involved for purposes of sentencing is reviewed for clear error. United States v. Leal, 74 F.3d 600, 607 (5th Cir. 1996) (noting that only a preponderance of the evidence must support the district court's determination). In addition, we review for clear error the district court's determination of relevant conduct during sentencing. United States v. Wilson, 116 F.3d 1066 (5th Cir. 1997).

The district court's decision to increase a defendant's offense level pursuant to Guidelines § 3B1.1 for his aggravating role in the transaction is a finding of fact that we also review for clear error. United States v. Narvaez, 38 F.3d 162, 166 (5th Cir. 1994). There must be an acceptable evidentiary basis for the court's factfindings at the sentencing hearing. Id. The district court's findings are not clearly erroneous if they are plausible in light of the record reviewed in its entirety. Id.

*Discussion*

Each of appellants Victor Kelley, Wright, Shaw, and Elmore contends that the district court incorrectly attributed 2,177.65 grams of cocaine base to his offense, instead of the amount with which each was directly connected as established by the testimony. In sentencing a defendant for participation in a drug conspiracy, the court must make findings with respect to (1) when the defendant joined the conspiracy, (2) what drug quantities were within the scope of the agreement, and (3) what quantities the defendant could reasonably foresee being sold by the conspiracy. United States v. Wilson, 116 F.3d 1066, 1076 (5th Cir. 1997). The base offense level under the Guidelines is determined by the quantity of drugs involved in the offense, and this quantity includes both drugs with which the defendant was directly involved, and drugs that can be attributed to the defendant in a conspiracy as part of his "relevant conduct" under the Guidelines. Leal, 74 F.3d at 607. Relevant conduct under the Guidelines includes all reasonably foreseeable acts of others in furtherance of the

conspiracy. <u>Wilson</u>, 116 F.3d at 1076-77 (citation omitted). However, the reasonable foreseeability of all drug sales does not automatically follow from membership in the conspiracy. <u>Id</u>. at 1077.

Appellants do not claim that the district court failed to make the required findings, but instead assert that the amount of drugs attributed to their relevant conduct was unreliable because it was based solely on the patently unbelievable and incredible testimony of CI Townes. For this very same reason (*i.e.*, Townes' allegedly unbelievable testimony), Victor Kelley, Wright, and Elmore and Shaw also dispute their designations as leader, manager, and members of a conspiracy, respectively.

For sentencing purposes, the district court may consider any relevant evidence "without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." <u>United States v. Rogers</u>, 1 F.3d 341, 343 (5th Cir. 1993) (quoting U.S.S.G. § 6A1.3). "More specifically, out-of-court declarations by an *unidentified* informant may be considered where there is good cause for nondisclosure of his identity and there is sufficient corroboration by other means." <u>Id</u>. (emphasis added). In <u>Rogers</u>, we upheld the district court's reliance on quantity-of-drug information provided by confidential informants, where there was no corroborati on of the amounts attributed to the defendant, but the government's investigation corroborated many other details of the drug scheme. <u>Id.</u> at 344.

Evaluat ing this claim under <u>Rogers</u>, we conclude that appellants' sentences must stand. Townes, although a government informant, actually testified in court. Therefore, the appellants had the opportunity to cross-examine him on this issue. In addition, Townes' testimony about various drug transactions with several of the appellants is corroborated by undercover agents. Moreover, the wiretap evidence secured by the government implicates t hese appellants as well. Evidence with a sufficient indicia of reliability was before the district court, and its determinations—both as to quantity of drugs and the appellants' roles in the offense—were not clearly erroneous.

Finally, Victor Kelly, Wright, Elmore and Shaw argue that the disparity between penalties for offenses involving cocaine base ("crack" cocaine) and cocaine hydrochloride ("powder" cocaine) is unconstitutionally vague. They concede, however, that their argument is foreclosed by Fifth Circuit

18

precedent.  <u>See</u>, <u>e.g.</u>, <u>United States v. Dukes</u>, -- F.3d --, 1998 WL 177988 *3 (5th Cir.(Tex.)) (noting that the distinction between cocaine base and powder cocaine is not ambiguous for purposes of a conviction).  Based on the well-settled law of this circuit, we decline appellants' invitation to revisit our holding on this issue.

## Conclusion

For the foregoing reasons, we deny appellants' claims and AFFIRM the decision of the district court.