# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 26, 2020

Lyle W. Cayce
Clerk

No. 19-30236

United States of America,

*Plaintiff—Appellee*,

*versus*

Roy Martin Herrera Romero; Oscar Arturo Machado-Galeana, *also known as* Sinaloan,

*Defendants—Appellants*.

Appeals from the United States District Court
for the Middle District of Louisiana
USDC No. 3:15-CR-32-7
USDC No. 3:15-CR-32-1

Before Graves, Costa, and Engelhardt, *Circuit Judges*.

Per Curiam:*

Defendant-Appellants Roy Martin Herrera Romero and Oscar Arturo Machado-Galeana appeal their convictions for drug trafficking charges. They contend that the district court erred in denying their motions to suppress

---

* Pursuant to 5th Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4.

No. 19-30236

wiretap evidence because the wiretap in this case was unnecessary and the Government listened in on too many non-pertinent communications, rendering the wiretap unlawful under 18 U.S.C. § 2518. Machado-Galeana also appeals his 300-month sentence. We affirm.

## I. Background

After a nine-day jury trial, Herrera Romero was convicted of possession of marijuana with intent to distribute. The same jury convicted Machado-Galeana of several offenses: conspiracy to possess with intent to distribute 50 grams or more of methamphetamine, less than 100 grams of heroin, and marijuana; conspiracy to launder monetary instruments; distribution of 50 grams or more of methamphetamine (four counts); possession with intent to distribute 50 grams or more of methamphetamine and marijuana; and possession of firearms in furtherance of a drug trafficking crime. Herrera Romero was sentenced to a 60-month term of imprisonment. Machado-Galeana was sentenced to serve 300 months: 240-month concurrent sentences for all counts save the firearms count, for which Machado-Galeana received a 60-month consecutive sentence.

The law enforcement investigation in this matter began on June 18, 2014, when a confidential informant alerted local police that Alexander Pined Nava was engaged in a methamphetamine trafficking operation in Baton Rouge, Louisiana. Shortly thereafter, law enforcement conducted several undercover purchases of substantial quantities of methamphetamine from Nava. Toll records from Nava's phone showed that he typically contacted Machado-Galeana around the time of the controlled purchases. Law enforcement continued conducting controlled purchases, each in escalating quantities, as well as physical surveillance of Nava's home. During one of the controlled purchases, Nava told undercover officers that a Mexican cartel supplied the methamphetamine, and that the methamphetamine was

smuggled across the Mexican border using military connections. Nava also said that he and his associates got their marijuana from California. After some of the controlled purchases, Nava's associates would follow the undercover officers, hampering law enforcement's ability to surveil Nava's activities.

Although the investigation revealed substantial evidence of drug trafficking by Nava, Herrera Romero and Machado-Galeana, the United States applied for a Title III wiretap order on Nava's cellphone in November 2014. According to the supporting affidavit, various traditional investigative techniques had revealed "the key members of the NAVA organization," but the Government was at a dead-end in determining an apparent conspiracy's scope and suppliers. The affidavit set out the investigative methods that law enforcement used, including: a cooperating source, controlled purchases, physical surveillance, pole cameras, undercover agents, consensually recorded phone calls, administrative subpoenas, telephone subscriber records, DMV records, police records, a search warrant, a GPS tracker, toll records, pen register/trap and trace data, a traffic stop used to identify a possible coconspirator, and screening the suspects' social media activity. The affidavit went on to assert that law enforcement had exhausted these methods, and that a wiretap on Nava's phone was needed to glean the trafficking operation's scope, structure, and suppliers. The district court signed the wiretap order for Nava's phone.

The Government later applied for and received a wiretap order for Machado-Galeana's phone; it submitted an application and a supporting affidavit similar to those used in the Nava wiretap application. Later, the district court granted a 30-day extension on the Machado-Galeana wiretap.

Before trial, Herrera Romero and Machado-Galeana moved to suppress evidence obtained via the wiretaps. Pointing to the substantial evidence that law enforcement obtained before the wiretaps, Herrera

Romero and Machado-Galeana contended that because the Government had not met 18 U.S.C. § 2518(3)(c)'s necessity requirement, the wiretaps were unlawful. After holding a hearing, the district court denied the motions to suppress, concluding that the Government had established the wiretaps' necessity.

The Government used two Spanish-speaking persons, Maria Reyes and Ricardo Robles, to monitor the intercepted telephone calls. Both monitors worked for private companies on contract with the Government. At a hearing on the United States' motion to authenticate the voices heard on the intercepted phone calls, a DEA agent testified that the monitors would "listen to the calls and determine if they are pertinent or non-pertinent." The monitors would also "make a synopsis, which is a . . . short description of the conversation." During Reyes' cross-examination at the authentication hearing, the following exchange occurred:

> Q. As I understand the process today, you and Mr. Robles were each assigned shifts to listen to the incoming calls and text messages on these wiretaps, correct?
> A. That's correct.
> Q. And I'm trying to gather here that on your shift you would be responsible for listening to every call that came in, correct?
> A. That's correct.
> Q. And you would listen to the calls in their entirety, correct?
> A. Correct.

Robles testified that he did not translate every call into English; instead he would "translate the calls that are pertinent and that are requested by the agent or the attorney." However, he did a synopsis, in English, for every call, and he contemporaneously entered notes during some calls. Agents then read the synopses and decided which calls needed to be transcribed. Robles said that a law enforcement agent was always with him while he worked. Neither Reyes nor Robles was specifically asked about minimization of non-pertinent

calls. The four fifteen-day reports that the Government submitted for the district court's review provide that the percentage of "calls minimized out of the total number of calls completed" ranged from 0.99% to 2.61%, but that most of the calls were under two minutes long. Of all calls longer than two minutes, minimization rates ranged from 3.5% to just under 14%.

After the authentication hearing, Herrera Romero, citing the monitors' testimony, moved again to suppress all wiretap evidence, arguing that the Government's minimization practices violated 18 U.S.C. § 2518(5). Machado-Galeana did not raise any argument regarding minimization. The district court denied Herrera Romero's motion, concluding that the Government's minimization practices were reasonable under the circumstances.

Much of the evidence presented at trial against Machado-Galeana consisted of witnesses reading aloud from transcripts of intercepted communications or identified speakers in recorded phone calls. Additionally, Nava testified that Machado-Galeana was the operation's leader. On October 4, 2018, a jury convicted Machado-Galeana of six counts of drug trafficking, one count of money laundering, and one count of possession of a firearm in furtherance of a drug trafficking crime. The same jury convicted Herrera Romero on one count of marijuana trafficking.

At sentencing, the district court concluded by a preponderance of the evidence that Machado-Galeana sent Nava's family threatening messages and had asked other inmates to kill Nava to prevent Nava from testifying. The district court also concluded that Machado-Galeana perjured himself at trial by asserting that Nava was the conspiracy's leader and that Nava coerced Machado-Galeana into committing the crimes of which he was charged. The district court then concluded that Machado-Galeana's total

offense level was 44,[1] which included a 2-level obstruction-of-justice enhancement for Machado-Galeana's false testimony. The guidelines imprisonment range for Machado-Galeana's offense level, along with a criminal history category of I, is life imprisonment. *See* U.S.S.G. Ch.5, Pt. A., Sentencing Table. Machado-Galeana, citing his lack of criminal history, requested a downward variance but did not request a specific sentence. The district court sentenced Machado-Galeana to 300 months' imprisonment, well below the guidelines range.

On appeal, Herrera Romero and Machado-Galeana both challenge the district court's decision that the Government satisfied 18 U.S.C. § 2518 with respect to the wiretap's necessity and minimization. Machado-Galeana also contends that the district court erred by applying the obstruction-of-justice enhancement, and that his 300-month sentence is substantively unreasonable.

## II. The Wiretap's Necessity

Both Herrera Romero and Machado-Galeana contend that the district court erroneously concluded that the Government established the wiretaps' necessity. They contend that the wiretaps were unnecessary because substantial evidence against them was obtained, or could have been obtained, through traditional investigative techniques. We review a district court's authorization of a wiretap for clear error. *United States v. Kelley*, 140 F.3d 596, 604 (5th Cir. 1998); *United States v. Butler*, 477 F. App'x 217, 219 (5th Cir. 2012). We review de novo whether the Government satisfied the necessity requirement. *United States v. Smith*, 273 F.3d 629, 632 (5th Cir. 2001); *Butler*, 477 F. App'x at 219.

---

[1] The district court treated Machado-Galeana's total offense level as 43 pursuant to U.S.S.G. Ch. 5, Pt. A., Application Note 2.

Title III of the Omnibus Crime Control and Safe Streets Act of 1968 generally prohibits law enforcement agents from intercepting wire, oral, and electronic communications without consent, absent prior judicial approval. 18 U.S.C. §§ 2510-2520; *United States v. Smith*, 978 F.2d 171, 173, 175 (5th Cir. 1992). Among other requirements, an application seeking a wiretap order must establish that "other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). To issue an order approving interception of wire communications, a judge must find that the Government has made the required showing of necessity. 18 U.S.C. § 2518(3)(c). This "necessity requirement," *Kelley*, 140 F.3d at 605, is meant to ensure that wiretaps are not "routinely employed as the initial step in criminal investigation." *United States v. Giordano*, 416 U.S. 505, 515 (1974).

In its affidavits seeking a wiretap authorization, the Government demonstrated that a wiretap was necessary to determine an apparent drug-trafficking conspiracy's scope and suppliers. Regarding traditional investigative techniques, the affidavits provided "[d]etails about the use of each technique" concerning the subjects of the investigation, "the success or failure of the technique, and what the technique has accomplished or failed to accomplish with regard to the goals and objectives of this investigation." The affidavits summarized the Government's use of confidential sources, controlled purchases, physical surveillance, undercover agents, search warrants, trash searches, a "GPS tracker," closed circuit television cameras, pen registers, trap and trace devices, "[t]oll [a]nalysis and [s]ubscriber [i]nformation," and "[m]ail [c]over [r]equests."

Herrera Romero and Machado-Galeana contend that, because these traditional methods yielded abundant evidence of their own crimes, wiretap surveillance was unnecessary. These arguments misunderstand the wiretap's objective. The affidavits explained that the Government had exhausted the

extent to which these methods could expose the conspiracy's scope, and, based on an apparent connection to a Mexican drug cartel and a marijuana supplier in California, as well as the organization's counter-surveillance efforts, continuing these more traditional methods would be futile and dangerous. *Cf. United States v. Webster*, 734 F.2d 1048, 1054-55 (5th Cir. 1984) (affirming a wiretap's necessity because extensive, traditional investigative methods would not further reveal a trafficking organization's scope).

Herrera Romero and Machado-Galeana also argue that other, less intrusive investigative methods could have revealed the information sought by the Government. However, the necessity requirement is not meant to "foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted." *Webster*, 734 F.2d at 1055. Thus, the Government does not have to show that it has exhausted every conceivable option before a wiretap may be approved. *Kelley*, 140 F.3d at 605. Instead, § 2518(c) requires a showing that "normal investigative techniques employing a normal amount of resources have failed to make the case within a reasonable period of time." *Id.* (internal quotation marks and citation omitted). Because the wiretap affidavits sufficiently established that traditional investigative methods were at a dead-end, and that a wiretap was necessary to glean an apparently sophisticated conspiracy's scope and suppliers, the district court did not err in concluding that the Government satisfied § 2518's necessity requirement.

## III. The Government's Minimization Practices

Herrera Romero and Machado-Galeana also argue that the district court should have suppressed all wiretap evidence because the Government and the monitors listened in on too many irrelevant conversations. We review the district court's "determination of the reasonableness of minimization

efforts for clear error." *United States v. Brown*, 303 F.3d 582, 603 (5th Cir. 2002). Under the clear error standard, we review the evidence in the light most favorable to the prevailing party. *United States v. Pack*, 612 F.3d 341, 347 (5th Cir. 2010). So long as a factual finding is plausible based on the record as a whole, it is not clearly erroneous. *See United States v. Raney*, 633 F.3d 385, 389 (5th Cir. 2011).

Although Herrera Romero raised the Government's minimization before the district court, Machado-Galeana did not; he challenges minimization for the first time on appeal. We have held that the "failure to raise *specific issues or arguments* in pre-trial suppression proceedings operates as a waiver of those issues or arguments for appeal." *United States v. Scroggins*, 599 F.3d 433, 448 (5th Cir. 2010) (emphasis in original). However, we may, "for good measure," consider the argument under the plain error standard. *Id.*; *see United States v. Baker*, 538 F.3d 324, 328-29 & n.1 (5th Cir. 2008). Under either standard, Herrera Romero and Machado-Galeana's arguments are unavailing because neither identifies specific conversations that should have been suppressed, and because the Government's minimization efforts, while perhaps lax, were not wholly unreasonable.

Herrera Romero and Machado-Galeana's failure to identify specific, excludable evidence is fatal to their claim because this court has rejected total suppression for minimization violations. *See United States v. Gaytan*, 74 F.3d 545, 554 (5th Cir. 1996) ("The exclusionary rule does not require the exclusion of those conversations that were properly intercepted as well.").[2]

---

[2] In *United States v. Hyde*, 574 F.2d 856 (5th Cir. 1978), this court stated, but did not hold, that "blatant disregard[]" of minimization requirements may merit total suppression. 574 F.2d at 869. The primary argument for total suppression is that piecemeal suppression of non-pertinent calls neither benefits the defendant nor deters the Government's minimization violations—the Government is unlikely to introduce irrelevant communications, and post hoc suppression of improperly intercepted calls places

But even if Herrera Romero and Machado-Galeana had identified specific communications to be suppressed, the district court did not clearly err. Section 2518(5) requires that wiretap surveillance "be conducted in such a way as to minimize the interception of communications not otherwise subject to interception[.]" 18 U.S.C. § 2518(5). To comply with § 2518(5), the "government's efforts to minimize interception of non-pertinent conversations must be objectively reasonable in light of the circumstances confronting the interceptor." *Brown*, 303 F.3d at 604 (internal quotation marks and citation omitted). In keeping with this reasonableness standard and its variance with each case's facts, the Supreme Court has cautioned that "blind reliance on the percentage of nonpertinent calls intercepted is not a sure guide to the correct answer." *Scott v. United States*, 436 U.S. 128, 140 (1978). We consider three factors in determining the objective reasonableness of the Government's minimization practices: "'(1) the nature and scope of the criminal enterprise under investigation; (2) the Government's reasonable inferences of the character of a conversation from the parties to it; and (3) the extent of judicial supervision.'" *Brown*, 303 F.3d at 604 (quoting *United States v. Bankston*, 182 F.3d 296, 307 (5th Cir. 1999)). Here, the defendant-appellants agree that "there was judicial supervision in

---

law enforcement in the same position as if it had properly minimized in the first place. However, total suppression could render wiretap investigations ineffective by requiring law enforcement to erroneously minimize coded, seemingly innocent calls out of fear that mistakenly listening could jeopardize the entire wiretap. For this reason, courts almost uniformly have declined complete suppression as a remedy for minimization abuses unless the defendant can show that the abuses tainted the investigation as a whole. *E.g.*, *United States v. Cox*, 462 F.2d 1293, 1301 (8th Cir. 1972) ("Clearly Congress did not intend that evidence directly within the ambit of a lawful order should be suppressed because the officers, while awaiting incriminating evidence, also gathered extraneous conversations. If appellants have a remedy under Title III other than the suppression of conversations outside the warrant's scope, it lies in . . . a civil suit against the investigating officers."). *See also United States v. Mansoori*, 304 F.3d 635, 648 (7th Cir. 2002); *United States v. Charles*, 213 F.3d 10, 22 (1st Cir. 2000); *United States v. Ozar*, 50 F.3d 1440, 1448 (8th Cir. 1995).

this case and agents seemingly anticipated a scheme substantially larger in scope than the one indicted."

Regarding the second factor—the extent to which Government can readily make reasonable inferences of conversation's character and participants—this court has recognized that the reasonableness of the Government's minimization rates will vary with each case's facts. This court generally has afforded deference to law enforcement "during the initial phase of an investigation, when the precise scope of and participants in the criminal scheme have not yet been identified." *Brown*, 303 F.3d at 604-05. Law enforcement is also unlikely able to quickly identify non-pertinent communications where the conspiracy uses coded or foreign languages. *See United States v. Clark*, 67 F.3d 1154, 1162 (5th Cir. 1995), *cert. granted, judgment vacated on other grounds sub nom. Coffman v. United States*, 519 U.S. 802 (1996); *United States v. Sanchez*, 961 F.2d 1169, 1178-79 (5th Cir. 1992) ("Where drug jargon is used over the phone, the government may engage in more extensive wiretapping and the interception of innocent calls may be a more reasonable activity."). Finally, minimization may not be feasible when most intercepted calls are under two minutes, because law enforcement may not have enough time to categorize a call in real time before the call terminates. *See Scott*, 436 U.S. at 140 ("[T]here are surely cases . . . where the percentage of nonpertinent calls is relatively high and yet their interception was still reasonable . . . [because] [m]any of the nonpertinent calls may have been very short. Others may have been one-time only calls . . . [or] ambiguous in nature."). When these indicia are present, low minimization rates may not be indicative of § 2518(5) violations.

Each of these indicia is present here. The district court noted that, through controlled methamphetamine purchases, law enforcement suspected that Herrera Romero and Machado-Galeana were members of a large and sophisticated conspiracy with connections to a Mexican drug cartel,

but the investigation was only months old, rendering distinguishing pertinent from non-pertinent calls difficult. Further, the intercepted communications were in Spanish and used "coded jargon," making it difficult for case agents to give real-time instructions to monitors regarding pertinence. Last, most of the intercepted calls were less than two minutes long and so not subject to quick categorization before the calls' termination. The intercepted calls in this case thus generally were not readily minimizable, and so the district court did not clearly err in concluding that the Government's minimization efforts were reasonable.

## IV. Machado-Galeana's 300-Month Sentence

Machado-Galeana also contests his 300-month sentence. He argues first that the district court erred in imposing a 2-level obstruction-of-justice enhancement, and second that his 300-month sentence is substantively unreasonable. We address both arguments in turn.

A defendant's guidelines offense level is increased by two if he or she "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction." U.S.S.G. § 3C1.1. A district court's determination that a defendant obstructed justice is a finding of fact that we review for clear error. *United States v. Zamora-Salazar*, 860 F.3d 826, 836 (5th Cir. 2017). Applying the preponderance-of-the-evidence standard, the district court concluded that Machado-Galeana repeatedly perjured himself at trial when he testified in his defense. Machado-Galeana contends that the enhancement's application to his offense level is unconstitutional because it penalizes him for testifying in his own defense. This argument misses the mark because "a defendant's right to testify does not include a right to commit perjury." *United States v. Dunnigan*, 507 U.S. 87, 96 (1993). Moreover, other grounds support the enhancement's application. *See United*

*States v. Dunigan*, 555 F.3d 501, 508 n.12 (5th Cir.) (citation omitted), *cert. denied*, 556 U.S. 1264 (2009). ("[I]t is an elementary proposition, and the supporting cases too numerous to cite, that this court may affirm the district court's judgment on any grounds supported by the record."). The district court adopted the presentence investigation report's conclusion that Machado-Galeana sought to dissuade Nava's testimony by asking other inmates to kill Nava and by sending threatening messages to Nava's mother, and these actions also support the § 3C1.1 enhancement. *See* U.S.S.G. § 3C1.1 & Application Note 4(a).

Machado-Galeana also contends that the district court violated his Sixth Amendment rights by using the preponderance-of-the-evidence standard in applying an enhancement that exposed him to a potential life sentence. However, this court, along with other courts of appeals, has consistently affirmed the preponderance standard's application to sentencing enhancements. *See, e.g.*, *United States v. Hagman*, 740 F.3d 1044, 1048 (5th Cir. 2014); *United States v. Gourley*, 168 F.3d 165, 171 n.10 (5th Cir. 1999). Further, the 2-level enhancement here did not significantly impact Machado-Galeana's sentence, because his 300-month sentence is below the guidelines imprisonment range even absent the enhancement. *See* U.S.S.G. Ch. 5, Pt. A., Sentencing Table (recommending a range of 360 months to life imprisonment for an offense level of 42). The enhancement's application thus does not implicate the constitutional concerns that Machado-Galeana raises.

Last, Machado-Galeana argues that his 300-month sentence is substantively unreasonable because he had no criminal history before the instant offense. Our review of the district court's sentencing decision is limited to determining whether the sentence is reasonable. *Gall v. United States*, 552 U.S. 38, 46 (2007). We typically review a sentence's substantive reasonableness for abuse of discretion, giving great deference to the district

court's findings and conclusions. *See Gall*, 552 U.S. at 51; *United States v. Key*, 599 F.3d 469, 475 (5th Cir. 2010). While Machado-Galeana requested a below-guidelines sentence, he did not request a specific sentence and so may not have preserved this issue. *See Holguin-Hernandez v. United States*, 140 S. Ct. 766-67 (2020) (concluding that that a "defendant who, *by advocating for a particular sentence*, communicates to the trial judge his view that a longer sentence is 'greater than necessary' has thereby informed the court of the legal error at issue in an appellate challenge to the substantive reasonableness of the sentence" (emphasis added)).

Whether plain error or abuse-of-discretion review applies, Machado-Galeana's challenge fails. A properly calculated sentence that is within or below the guidelines range is presumed substantively reasonable on appeal. *United States v. Simpson*, 796 F.3d 548, 557 (5th Cir. 2015); *United States v. Cooks*, 589 F.3d 173, 186 (5th Cir. 2009). To overcome the presumption of reasonableness, Machado-Galeana must show that the district court failed to consider a factor specified by 18 U.S.C. § 3553(a) that should have received significant weight, or that the district court attributed significant weight to an improper consideration. *Cooks*, 589 F.3d at 186. Machado-Galeana notes that he has no criminal history, but the district court expressly considered his lack of a criminal history and, in any case, his sentence falls below the applicable guidelines range for his offense level and criminal history category. Machado-Galeana also asserts that the district court "did not adequately consider the impact on Mr. Machado's family and his personal characteristics in imposing the sentence," but Machado-Galeana does not identify what the district court should have considered, and so cannot overcome the presumption of reasonableness.

## VI. Conclusion

The district court did not err in concluding that the wiretaps in this case were necessary and that the Government's minimization practices did not warrant total suppression. The district court did not clearly err in applying a 2-level obstruction-of-justice enhancement, and Machado-Galeana has not overcome the presumption his below-guidelines sentence is substantively reasonable. Accordingly, the judgment of the district court is AFFIRMED.