UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 01-30173

_____


UNITED STATES of America,

                              Plaintiff-Appellee,

                    v.

              James Harvey BROWN,

                              Defendant-Appellant.


_____

        Appeal from the United States District Court
           For the Middle District of Louisiana

_____

                  August 23, 2002


Before DAVIS, EMILIO M. GARZA, and STEWART, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

     James Harvey Brown appeals his convictions for making false

statements to the FBI in violation of 18 U.S.C. § 1001 on

numerous grounds.  Because we conclude that any error that the

district court may have committed was harmless under the

circumstances, we affirm Brown's convictions.

                              I.

     This appeal arises out of a federal prosecution of former

Louisiana Governor Edwin Edwards, Louisiana Insurance

Commissioner James Harvey "Jim" Brown ("Brown"), and attorney Ronald Weems for allegedly engaging in a scheme of public corruption. The government charged that the three defendants committed federal crimes in connection with a 'sham settlement' that derailed a $27 million lawsuit threatened by the State of Louisiana against David Disiere, president of Cascade Insurance Company ("Cascade"), a failed automobile insurance carrier.[1] The indictment charged numerous counts of conspiracy, mail and wire fraud, insurance fraud, witness tampering, and making false statements.[2]

The FBI became aware of Brown's involvement in the Cascade matter from conversations recorded through electronic surveillance of Edwards' home and office. The FBI recorded various conversations between Brown and Edwards about Cascade and Disiere. As a result, in May 1997, FBI agents Harry Burton and David Lyons interviewed Brown to ascertain his knowledge of and involvement in the Cascade matter. Brown's attorney, Bradley Myers, was also present at the interview. The interview was not

---

[1]     See United States v. Brown, 218 F.3d 415, 418 (5th Cir. 2000).

[2]     The Cascade trial at issue in this appeal was the second of three federal prosecutions involving former Governor Edwards. In the first trial, Edwards and several other defendants were convicted of charges based on bribery to obtain a riverboat gambling license. In the third trial, also involving bribery allegations, the jury convicted Cecil Brown on seven out of nine counts. Edwards was an unindicted co-conspirator in that case and testified as a witness for Brown. See United States v. Brown, 250 F.3d 907, 910 (5th Cir. 2001).

recorded, but Burton took notes by hand. Burton claims that, during the interview, Brown denied discussing the Cascade matter with Edwards and denied having knowledge of any "settlement issues" involving Cascade. The interview took place on a Friday. The following Monday, Burton, using his notes, prepared a 302 report, recording the substance of his interview with Brown. The parties agree that all FBI procedures were followed in preparing the report. Both Agents Burton and Lyons initialed the report, indicating their belief that the 302 was an accurate record of the interview.

This case was originally assigned to Judge Polozola, District Judge for the Middle District of Louisiana. In March 2000, Judge Polozola issued an order denying Brown's discovery request for production of Agent Burton's hand-written notes of his interview of Brown. However, in July 2000, all the judges in the Middle District recused themselves, and the case was promptly assigned to Judge Clement, then a district judge for the Eastern District of Louisiana. Judge Clement issued several pre-trial orders in which: (1) agreeing with Judge Polozola, she denied production of Burton's notes; (2) she ordered an anonymous jury; and (3) she admitted evidence procured from electronic surveillance of Edwards' home and office. With respect to Agent Burton's hand-written notes, Judge Clement reviewed the notes <u>in camera</u> and determined that the 302 report already disclosed to

the defense accurately reflected the information contained in the notes. Accordingly, the court denied the defense's request for production of the notes.

Trial began in September 2000. At trial, Burton testified about his interview of Brown during his investigation into the Cascade settlement. Burton used his 302 to refresh his memory, but the 302 was not admitted into evidence. The defense had access to the 302, but in accordance with the district court's pre-trial order, not Burton's hand-written notes.

Edwards and Weems were acquitted of all charges. Brown was acquitted on most counts, but was found guilty on seven counts of making false statements to Agent Burton in violation of 18 U.S.C. § 1001. In January 2001, the district court issued a 58-page ruling on Brown's pending post-trial motions, acquitting him of two of the false statement convictions but upholding the others, and again denying Brown's request to compel production of Agent Burton's notes. Brown was sentenced to six months' imprisonment on each count to be served concurrently.[3]

Brown now appeals on several grounds: (1) that the district court erred in not compelling the production of Burton's hand-written notes; (2) that the district court abused its discretion in limiting cross-examination of Burton regarding the notes and

---

[3] Brown also was sentenced to two years of supervised release on each count to be served concurrently after imprisonment and fined $10,000 for each count, for a total fine of $50,000.

in issuing an instruction concerning the absence of the notes; (3) that the district court abused its discretion in excluding the testimony of C.J. Blache, a witness the defense hoped would call into question Burton's ability to produce accurate 302 reports; (4) that the evidence was insufficient to support the conviction on Count 51; (5) that the district court abused its discretion in ordering an anonymous jury; and finally (6) that the district court erred in admitting evidence procured from electronic surveillance of Edwards' home and office.  We discuss each of Brown's arguments in turn below.

## II.

Brown first argues that the district court erred in refusing to order the government to disclose Burton's handwritten interview notes.  Brown contends that he was entitled to the notes as a matter of law under Federal Rules of Criminal Procedure 16(a)(1)(A) and (a)(1)(C) and the Jencks Act, 18 U.S.C. § 3500.  Brown also asserts that nondisclosure of the notes denied him the right to a fair trial in violation of Brady v. Maryland,[4] because alleged discrepancies between Burton's notes and the 302 were material to Brown's defense theory that Burton had manufactured the false statement charges against Brown.  For these reasons, Brown argues that he is entitled to a new trial. We address each of these issues below.

---

[4]      373 U.S. 83 (1963).

-5-

A.

Brown first contends that he was entitled to Agent Burton's interview notes as a matter of law under Federal Rule of Criminal Procedure 16(a)(1)(A). We review the district court's interpretation of Rule 16(a)(1) de novo, but its decision to withhold the notes only for abuse of discretion.[5]

Rule 16(a)(1)(A) provides, in relevant part:

Upon request of a defendant the government must disclose to the defendant and make available for inspection, copying, or photographing: any relevant written or recorded statements made by the defendant, or copies thereof, within the possession, custody, or control of the government, the existence which is known, or by the exercise of due diligence may become known, to the attorney for the government; that portion of any written record containing the substance of any relevant oral statement made by the defendant whether before or after arrest in response to interrogation by any person then known to the defendant to be a government agent . . . .[6]

The Seventh Circuit considered a case similar to the one at hand in United States v. Muhammad.[7] In that case, the defendant, Muhammad, was convicted of obstruction of justice and bribery.[8] Muhammad was serving as a juror in an unrelated case when he offered to sway fellow jurors to rule in favor of a party in the

---

[5] See United States v. Ross, 511 F.2d 757, 762 (5th Cir. 1975).

[6] Fed. R. Crim. P. 16(a)(1)(A) (emphasis added).

[7] 120 F.3d 688, 699 (7th Cir. 1997).

[8] Id. at 692.

case in exchange for money.[9] In an interview with two FBI agents, Muhammad allegedly confessed that he committed the crime.[10] At trial, one of the agents testified that he witnessed Muhammad's confession during the interview, using the 302 report prepared by the other agent to refresh her recollection.[11] The government disclosed the 302, but not the handwritten interview notes used to prepare the 302. The defendant sought disclosure of the notes.[12] The district court reviewed the agent's notes, found that the 302 report was a faithful summary of the notes, and refused to order disclosure.[13]

The Seventh Circuit affirmed.[14] The court held that a criminal defendant "is not entitled to an agent's notes if the agent's report contains all that was in the original notes."[15] The court noted that the district court found no inconsistencies between the 302 and the interview notes and that the defendant had access to the 302 for use in cross-examination.[16] The

---

[9] Id. at 691-92.

[10] Id. at 692.

[11] Id. at 698.

[12] Id.

[13] Id. at 699.

[14] Id.

[15] Id.

[16] Id.

Seventh Circuit has since stressed that Rule 16(a)(1)(A) does not require disclosure of an agent's notes even where there are "minor discrepancies" between the notes and the disclosed 302.[17]

We agree. Rule 16(a)(1)(A) does not grant a criminal defendant a right to preparatory interview notes where the content of those notes have been accurately captured in a type-written report, such as a 302, that has been disclosed to the defendant. The government satisfies its obligation under the Rule when it discloses a 302 report that contains all of the information contained in the interview notes. We therefore reject Brown's contention that Rule 16(a)(1)(A) entitles a criminal defendant to preparatory interview notes in every case.[18]

---

[17] United States v. Coe, 220 F.3d 573, 583 (7th Cir. 2000) (holding that the district court did not abuse its discretion in refusing to order the disclosure of handwritten interview notes where the government had disclosed a type-written report that accurately summarized the notes).

[18] Brown also asserts that the 1991 amendment to Rule 16(a)(1)(A) bolsters his position that he is entitled to Burton's notes as a matter of law. We disagree. The 1991 Amendment to Rule 16(a)(1)(A) broadened the scope of the Rule by requiring disclosure to criminal defendants of statements "without regard to whether the prosecution intends to use the statement at trial." Fed. R. Crim. P. 16 advisory committee's note. In contrast, the pre-1991 Rule required disclosure of records only of those statements "which the government intend[ed] to offer in evidence at the trial." Fed. R. Crim. P. 16(a)(1)(A) (1991). The purpose of the 1991 amendment, therefore, was merely to require full disclosure of every statement of the defendant, regardless of whether the government intended to use the statement at trial. It follows that Brown's assertion that the 1991 amendment significantly changed the types of records that must be disclosed is incorrect.

Moreover, as we discuss in detail in Part II.D. of this opinion, in this case, Burton's notes are substantially identical to the 302 report that was disclosed to Brown with respect to all counts of which Brown was convicted, with the possible exception of Count 50.[19] For the reasons given in that section of the opinion, however, even assuming that the difference between the notes and the 302 with respect to Count 50 is significant, we conclude that any error that the district court may have committed in that regard was harmless in light of Brown's own trial testimony.[20]

B.

Brown next argues that he was entitled to disclosure of the notes as a matter of law under Federal Rule of Criminal Procedure 16(a)(1)(C). This court reviews a district court's order not to disclose material under Rule 16(a)(1)(C) for abuse of discretion.[21] Rule 16(a)(1)(C) requires production of documents

---

[19] We engage in a detailed comparison of Agent Burton's notes and the 302 in Part II.D. of this opinion, in which we address Brown's claims under Brady v. Maryland, 373 U.S. 83 (1963).

[20] See United States v. Kimbrough, 69 F.3d 723, 731 (5th Cir. 1995) (holding that "any prejudice or technical violation of Rule 16 is insufficient to comprise a deprivation of [the defendant's] constitutional rights" and therefore, upholding his conviction); United States v. Manetta, 551 F.2d 1352, 1356 (5th Cir. 1977) (holding that violation of Rule 16 in that case was not harmless error).

[21] See United States v. Luffred, 911 F.2d 1011, 1015 (5th Cir. 1990).

that are "material to the preparation of the defense."[22]

We reject Brown's assertion that Rule 16(a)(1)(C) requires production of preparatory interview notes in every case. Preparatory notes are not always, as Brown argues, material to the defense. Rather, we hold that the government fulfills the requirements of Rule 16(a)(1)(C) when it discloses to the defendant a 302 report that accurately reflects the contents of the interviewer's rough notes. In such cases, the notes are not "material" to the defense. Therefore, Rule 16(a)(1)(C) does not, as Brown maintains, entitle him to production of the notes without regard to the accuracy of the 302 that the government disclosed to the defense.

As explained in Part II.D. of this opinion, Burton's notes are completely consistent with the 302 that was disclosed to Brown in all respects, except possibly Count 50. For the same reasons given in that section of the opinion, we hold that any error the district court may have committed in this respect was harmless.[23]

C.

Brown also argues that he was entitled to disclosure of

---

[22]   See id. (holding that the district court did not abuse its discretion in refusing to order production of government files under Rule 16(a)(1)(C)).

[23]   See Kimbrough, 69 F.3d at 731.

-10-

Burton's notes as a matter of law under the Jencks Act.[24]  This
court reviews the district court's determination that the notes
do not constitute a "statement" requiring disclosure under the
Jencks Act for clear error.[25]

The Jencks Act requires the government "to produce any
statement (as hereinafter defined) of the witness in the
possession of the United States which relates to the subject
matter as to which the witness has testified."[26]  A "statement"
includes "a written statement made by said witness and signed or
otherwise adopted or approved by him."[27]  The Act entitles a
criminal defendant to "relevant and competent reports and
statements in the possession of the Government touching the
events and activities as to which a Government witness has
testified at the trial."[28]  Brown argues that the notes are a
"statement" of Burton, a testifying witness, and therefore, he is
entitled to them under the Jencks Act.

In United States v. Martin,[29] the defendant, Martin, was

---

[24]    18 U.S.C. § 3500 (2002).

[25]    See United States v. Martinez, 87 F.3d 731, 734 (5th Cir.
1996).

[26]    18 U.S.C. § 3500(b).

[27]    18 U.S.C. § 3500(e)(1).

[28]    Goldberg v. United States, 425 U.S. 94, 104 (1976)
(quoting S. Rep. No. 981, 85th Cong. 3 (1957)) (internal quotation
marks omitted).

[29]    565 F.2d 362, 363 (5th Cir. 1978).

-11-

convicted of interstate transportation of a stolen motor vehicle. An FBI agent testified that Martin confessed during an interview that he knew the vehicle was stolen and made other incriminating statements.[30]  The defendant, however, denied that he made any of these statements.[31]  After the agent testified, the government gave the defense copies of 302 reports that summarized the agent's description of the interview, but did not disclose the agent's rough interview notes because the agent had destroyed them according to then-accepted FBI procedures.[32]  The defense argued that destruction of the agent's notes violated the Jencks Act and entitled him to a new trial.[33]

This court held that there was no Jencks Act violation.[34] We stated that "[n]othing in the Jencks Act requires that notes made in the course of an investigation be preserved after the notes have served their purpose of assisting in the preparation of interview reports."[35]

---

[30]    Id.

[31]    Id.

[32]    Id.

[33]    Id.

[34]    Id. at 363-64.

[35]    Id. (quoting United States v. Pacheco, 489 F.2d 554, 566 (5th Cir. 1974)) (internal quotation marks omitted); See also United States v. Ramirez, 954 F.2d 1035, 1038-39 (5th Cir. 1992) (holding that agent's rough notes were not statements under the Jencks Act where notes were scattered and all the information contained in them was available to the defendant in other forms).

Although this reasoning likely extends to the present case, we need not decide this issue because we conclude that even if the district court violated the Jencks Act in this case, such error was harmless.[36] As we discuss in detail in Part II.D. of this opinion, Burton's notes are identical to the 302 in all key respects, with the possible exception of Count 50. As explained in that section, however, any discrepancy between the notes and the 302 in that regard is completely irrelevant in light of Brown's trial testimony. Thus, we reject Brown's argument on this issue.

D.

Finally, Brown argues that nondisclosure of the notes violated his due process rights under <u>Brady v. Maryland</u>.[37] Under <u>Brady</u>, the government's failure to disclose evidence to the defense violates the defendant's due process rights where the evidence is (1) favorable to the defense; and (2) material to guilt or punishment.[38] Materiality is present if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been

---

[36] <u>See</u> <u>United States v. Ramirez</u>, 174 F.3d 584, 587 (5th Cir. 1999) ("Even when a violation [of the Jencks Act] is found, the failure to produce prior statements is subject to a harmless error analysis."); <u>United States v. Sink</u>, 586 F.2d 1041, 1050-51 (5th Cir. 1978).

[37] 373 U.S. 83, 87 (1963).

[38] <u>Id.</u>; <u>see also</u> <u>East v. Johnson</u>, 123 F.3d 235, 237 (5th Cir. 1997).

-13-

different.[39]  A "reasonable probability" exists when suppression of the evidence "undermines confidence in the outcome of the trial."[40]  "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."[41]

Brown maintains that he did not receive a fair trial because production of Burton's notes was essential to his defense theory that Burton manufactured the false statement charges against him. Brown asserts that post-trial release of the notes reveals significant discrepancies between Burton's notes and the 302. Pointing out these discrepancies to the jury, he contends, would have greatly bolstered his defense.

After conducting in camera review of Burton's notes, the district court compared the notes to the 302 in painstaking detail in its January 2001 order on Brown's post-trial motions.[42] The district court found that "the rough notes and the 302 contain no discrepancies that would have aided Mr. Brown's

---

[39]    See United States v. Bagley, 473 U.S. 667, 682 (1985).

[40]    Id. at 678.

[41]    Kyles v. Whitley, 514 U.S. 419, 434 (1994).

[42]    R. at 2459-64.

-14-

defense."[43]  The court further found that the defense was able to attack successfully on cross-examination "Burton's ability to <u>write things down correctly</u> in his notes or to <u>copy things correctly</u> from his notes to his 302."[44]

After a complete review of the record, we agree.  With the possible exception of Count 50, Burton's notes are nearly identical to the 302 to which Brown had access with respect to every one of Brown's false statement convictions.  We set out in some detail below our reasons for the above conclusion by comparing Burton's notes to the 302 with respect to each of Brown's five false statement convictions, turning first to Counts 48, 51, 54, and 55, and reserving discussion of Count 50 for last.

<u>COUNT 48</u>:

- <u>The Indictment Charges</u>:

    BROWN falsely stated he had never had any specific discussions with RONALD R. WEEMS, an attorney for Disiere, concerning settlement issues associated with Cascade Insurance Company when in truth and in fact BROWN well knew that he had conversations with WEEMS concerning settlement issues involving the Cascade Insurance Company.[45]

- <u>The 302 States</u>:

    To a direct question, BROWN indicated a knowledge that RON WEEMS was associated with the CASCADE INSURANCE COMPANY as its Attorney of Record.  He advised, however, he never

---

[43]    R. at 2459.

[44]    R. at 2456 (emphasis in original).

[45]    Ind. at 46.

had any specific discussions with RON WEEMS concerning settlement issues associated with CASCADE.

WEEMS would come to the department on a number of occasions, usually to meet with KIP WALL, and on occasion would peek in and say hello to BROWN. BROWN however had no specific discussion with WEEMS concerning the efforts of CASCADE INSURANCE COMPANY to settle the matter, nor did BROWN he [sic] reach any agreement with WEEMS on the settlement of the matter, as he had nothing to do with the negotiations and settlement of the issues against CASCADE INSURANCE COMPANY.[46]

. . . .

To a direct question, BROWN indicated that he never had any specific conversation with RON WEEMES [sic] with regard to the CASCADE matter and more particularly, never discussed with WEEMES [sic] anything concerning specific negotiations to settle the matter.

WEEMS would come by his office on occasion and they would discuss a number of things, to include other clients and other matters, and there was never any specific discussions of what it would take to resolve the litigation against DAVID DISIERE.

JOE CAGE on occasion came with RON WEEMS to the department. BROWN did not recall any "one, two, three, . . . concerning what it would take to settle the case."[47]

- Burton's Notes State:

Weems – come to see he and Kip Wall.
    Peek in and say hello.[48]

. . . .

Weems – Did he talk with him – "specific
    negotiations" –
        Would come by – discuss lots of things
    – other clients, other matters,

---

[46]    Burton's Form 302 at 4-5.

[47]    Burton's Form 302 at 7.

[48]    Burton's Interview Notes at 2.

         No specific discussion
         No specific negotiations

Cage with Weems – Don't recall any
     one, two three . . . concerning what it
  would take to settle the case.[49]

COUNT 51:

- The Indictment Charges:

     BROWN falsely stated that he met with EDWARDS at
EDWARDS' office but the conversations only related to
political matters and he, BROWN, was delivering an
"innocuous" form to EDWARDS when in truth and in fact BROWN
well knew that he met with EDWARDS at EDWARDS' office to
discuss more than political matters.  In fact, BROWN
specifically discussed strategical issues involving David
Disiere and the Cascade Estate.[50]

- The 302 States:

     To a specific question, BROWN indicated that he has met
with EDWIN EDWARDS before, at EDWARDS' office.

     He specifically indicated that on one occasion, EDWARDS
asked him to bring a "form" by for EDWARDS.  BROWN was going
to his wife's restaurant and it was close to EDWARDS'
office, so he indicated to EDWARDS he would bring the form
by and visit with him.

     To a direct question, BROWN indicated that the form had
nothing to do with CASCADE INSURANCE COMPANY, or any actions
involving DAVID DISIERE.

     His conversation with EDWARDS in the office related to
political matters and what was going on in State Government
and it had nothing to do with CASCADE INSURANCE COMPANY or
DAVID DISIERE.

     He didn't even recall what the form was but
characterized it as "somewhat innocuous."[51]

_____

[49]    Burton's Interview Notes at 6-7.

[50]    Ind. at 46.

[51]    Burton's Form 302 at 8.

- **Burton's Notes State:**

```
E/E – asked for a form – was going out
    to his wife's restaurant –
    Leadership challenge – but nothing
  to do with this matter

  Form – ? – "somewhat innocuous."[52]
```

COUNT 54:

- **The Indictment Charges:**

BROWN falsely stated he had "no conversation with anyone about an amount of settlement" concerning the Cascade Insurance Company matter when in truth and in fact BROWN well knew he had conversations with several people about what it would take to settle the Cascade Insurance matter.[53]

- **The 302 States:**

BROWN "had no conversations with anyone about an amount of settlement" concerning the CASCADE INSURANCE COMPANY matter.

BROWN didn't know when the settlement was made and didn't know how much the case was settled for.[54]

- **Burton's Notes State:**

```
No conversation with anyone about any
 amount of settlement.
    Didn't know then and doesn't know
 now the settlement amount.[55]
```

COUNT 55:
- **The Indictment Charges:**

BROWN falsely stated that he had never discussed specifics of a settlement regarding Cascade Insurance

---

[52]    Burton's Interview Notes at 7.

[53]    Ind. at 46.

[54]    Burton's Form 302 at 9.

[55]    Burton's Interview Notes at 8.

Company with Judge Sanders when in truth and in fact BROWN well knew that he had discussed specifics of a settlement regarding Cascade Insurance Company with Judge Sanders.[56]

• The 302 States:

BROWN never discussed with Judge SANDERS the specifics of the settlement regarding CASCADE INSURANCE COMPANY.[57]

. . . .

Again, BROWN indicated that he had contact with SANDERS from time to time; however, he never met with or discussed with SANDERS the matter of DAVID DISIERE.[58]

• Burton's Notes State:

Never discussed with Sanders the
 specifics of the settlement.[59]

. . . .

Never met with Sanders re Disiere[60]

Based on this comparison, we are satisfied that Burton's notes do not constitute Brady material with respect to Counts 48, 51, 54, and 55. The notes are neither (1) favorable to the defense; nor (2) material to Brown's guilt or punishment as to those counts.[61] The 302 report to which Brown had access during

---

[56] Ind. at 46.

[57] Burton's Form 302 at 9.

[58] Burton's Form 302 at 10.

[59] Burton's Interview Notes at 9.

[60] Burton's Interview Notes at 9.

[61] See United States v. Martin, 565 F.2d 362, 364 (5th Cir. 1978) (holding that an FBI agent's rough notes of an interview of the defendant were not Brady material because there was no independent showing that they contained evidence that was material

-19-

the trial is almost identical to Burton's rough interview notes. If anything, disclosure of the notes would have supported the accuracy of the 302 and corroborated Agent Burton's testimony. Moreover, we are not persuaded that Brown could have used the notes in preparation of his defense any more effectively than the virtually identical 302. Finally, given that Burton's notes are fully consistent with the 302, nondisclosure of the notes certainly did not "undermine confidence in the outcome at trial." For these reasons, we conclude that Brown was not denied due process under <u>Brady</u> with respect to Counts 48, 51, 54, and 55, and therefore reject his <u>Brady</u> arguments with respect to those counts.

We now compare Burton's notes to the 302 as to the more problematic Count 50.

<u>COUNT 50</u>

- <u>The Indictment Charges:</u>

BROWN falsely stated that although he knew EDWARDS was representing Disiere in some way, he never had any discussions with EDWARDS concerning settlement issues or what it would take to settle the matter between the Estate of Cascade Insurance Company and David Disiere when in truth and in fact BROWN well knew he had discussions with EDWARDS concerning settlement issues involving the Cascade Estate and David Disiere.[62]

- <u>The 302 States:</u>

BROWN believed that EDWIN EDWARDS was linked to the

---

to the defendant's guilt or innocence).

[62]     Ind. at 46.

settlement issues in some way.

BROWN recalled receiving a telephone call from EDWIN EDWARDS, who indicated that he had been hired by DISIERE to try and resolve the outstanding issues of CASCADE, and had been placed on what BROWN recalled was a $10,000 retainer.

He characterized EDWIN EDWARDS as an "advisor to CASCADE and DISIERE," but did not know EDWARD's [sic] specific role in the settlement process.

His conversation with EDWIN EDWARDS was a request for BROWN to provide EDWARDS with some background information concerning CASCADE, the suit against CASCADE, and the outstanding litigation.[63]

. . . .

With regard to EDWIN EDWARDS' part in the litigation, no one ever told him why they hired EDWIN EDWARDS, but it was his recollection that EDWARDS indicated to him that he had been hired to try and resolve the matter.[64]

. . . .

EDWIN EDWARDS called BROWN on several occasions. Again, the initial call concerning CASCADE INSURANCE COMPANY was to inform him of the fact that he had been hired to help resolve the matter and EDWARDS merely wanted some background information concerning CASCADE INSURANCE COMPANY and DAVID DISIERE. EDWARDS may have asked him for information concerning the lawsuit that was filed by WEEMS against Judge SANDERS; however, there was never any discussion with EDWARDS concerning settlement issues or what it would take to settle the matter.

BROWN indicated that any decision with regard to settlement was that of Judge SANDERS, and BROWN would have no authority, and the judge would make the final decision regarding any litigation or settlement in the matter.[65]

. . . .

---

[63]    Burton's Form 302 at 6-7.

[64]    Burton's Form 302 at 7.

[65]    Burton's Form 302 at 7-8 (emphasis added).

-21-

With regard to EDWIN EDWARDS, BROWN believed that EDWARDS was paid a $10,000 retainer fee "to bring this thing to and [sic] end," however BROWN didn't specifically know what role EDWIN EDWARDS had in bringing it to an end.

BROWN indicated that we would have to ask ED GONZALES about that, as he was the center of the suit and the settlement and BROWN didn't know whether GONZALES was a friend of EDWARDS.[66]

- Burton's Notes State:

Edwin Edwards
   [line drawn to connect]
   In some way connected – or when he came
      in, but advisor to Cascade + Disiere
         Don't know his role[67]

. . . .

They never told him why they hired him

Was aware of Edwards being a part of the team hired to try to resolve this matter[68]

. . . .

Edwin Edwards – called Brown on several
      occasions–
       –Wanted Background – re case –
       –More on lawsuit – confrontation with
          Weems – also

      Decision that Judge would make –
      He would have no authority + Judge
would make the final decision.[69]

. . . .

E/E 10,000.00 retainer fee to bring this thing

---

[66]   Burton's Form 302 at 11.

[67]   Burton's Interview Notes at 5.

[68]   Burton's Interview Notes at 6.

[69]   Burton's Interview Notes at 7.

-22-

to an end.

>  Don't know what role E/E had in
>      bringing it to an end –
>        Have to ask Gonzales – He was in the
>        center of the lawsuit and the settlement
>        Don't know if he is a friend of <u>Edwards</u>[70]

Count 50 charges Brown with falsely stating to Burton that "he never had any discussions with EDWARDS concerning settlement issues or what it would take to settle the [Cascade] matter."[71] Similarly, the 302 states that Brown stated that "there was never any discussion with EDWARDS concerning settlement issues or what it would take to settle the matter."[72]  However, there is no corresponding statement to that effect in the notes.

Nevertheless, even if this discrepancy is sufficient to entitle Brown to the notes under <u>Brady</u>, which we do not decide, we hold that any error the district court may have committed in refusing to compel production of the notes as to Count 50 was harmless.  <u>Brady</u> is based partly on a defendant's need to know any exculpatory evidence, and holds that suppression of requested information favorable to an accused violates due process.[73] However, <u>Brady</u> "is limited by the harmless error rule, and does

---

[70]    Burton's Interview Notes at 11 (emphasis in original).

[71]    Ind. at 46.

[72]    Burton's Form 302 at 8.

[73]    See <u>Brady v. Maryland</u>, 373 U.S. 83, 87-88 (1963); <u>see also</u> <u>United States v. Garcia</u>, 917 F.2d 1370, 1375 (5th Cir. 1990); <u>United States v. Cochran</u>, 697 F.2d 600, 607 (5th Cir. 1983).

not compel reversal when the defense was able to adequately prepare his case."[74]

As to Count 50, Brown attempts to persuade this court that a swearing match took place at trial between Agent Burton and himself as to whether Brown actually made the statement at issue. Our review of the record indicates otherwise. On direct examination, defense counsel asked Brown, "[D]id you talk to Edwin Edwards about the settlement issues?"[75] Brown responded, "I never did because I didn't know the settlement issues."[76] Brown then explained that he understood Burton's question to be whether Brown had talked with Edwards about the final settlement that was ultimately reached in the Cascade matter.[77] Brown's defense was not that he never made this statement to Agent Burton, but that his negative answer to Burton's question, viewed in this light, was true. The jury heard this testimony and rejected it. The notes do not make Brown's alleged interpretation of Burton's question any more probable. Therefore, we hold that any error the district court may have committed in refusing to order production of the notes as to Count 50 was harmless.

---

[74] _Garcia_, 917 F.2d at 1375; _see also_ _Cochran_, 697 F.2d at 607.

[75] R. at 2550.

[76] _Id._

[77] _Id._

-24-

III.

Brown next argues that the district court violated his rights under the Confrontation Clause of the Sixth Amendment by refusing to allow the defense to question Agent Burton about the contents of his notes and by offering jury instructions as to why the notes were not before the jury.  Limitations on the scope and extent of cross-examination are reviewed for abuse of discretion.[78]

As discussed above, Agent Burton testified at trial about his interview of Brown.  Burton used his 302 to refresh his memory, but the 302 was not admitted into evidence.  On cross-examination, Brown's attorney extensively questioned Burton about his procedures for recording interviews, including his note-taking procedures and preparation of 302 reports.

Defense counsel then asked Burton where his notes were, knowing they were with the court.[79]  The government objected, and the district court again sustained the objection.  A side-bar followed, at which defense counsel informed the court that he wanted it to instruct the jury that he did not have the notes because the court had ruled that the defense was not entitled to them.[80]  Brown's counsel explained that he thought that "the jury

---

[78]    See United States v. Sudderth, 681 F.2d 990, 996 (5th Cir. 1982).

[79]    R. at 1604-05.

[80]    R. at 1606-08.

ought to understand I don't have the notes and can't show them to [Agent Burton]."[81]  Accordingly, the district court instructed the jury:

> Ladies and Gentlemen, before trial, we had a pretrial motion in limine as to whether handwritten notes that are recorded contemporaneously with the F.B.I. interview are something that needs to go to the defense lawyers, and the law in this circuit is they do not because what they get is the finished product, the typed product.  In some cases the Court is asked to determine whether the typed, finished product is accurate based on the handwritten notes, and that procedure was followed before this trial.  The notes were never made available to defense counsel, so he cannot present them to you or use them to cross-examine this witness with.  He asked me to explain that procedure to you.[82]

Brown's counsel moved for a mistrial on the ground that, by so instructing the jury, the district court had vouched for the accuracy of the 302.[83]  The district court rejected the motion for a mistrial.[84]  Brown's counsel then requested that the court give a curative instruction.[85]  As a result, the court instructed the jury that:

> [A]s to whether the 302 is accurate or whether I have reviewed anything, my determination of anything is totally irrelevant.  I did not intend to tell you that [the 302] was accurate because that is not within my province.  You need to determine the credibility of the witness . . . To the extent that I told you anything contradictory to your job,

---

[81]    R. at 1606.

[82]    R. at 1609-10.

[83]    R. at 1621-22.

[84]    R. at 1624.

[85]    R. at 1624-25.

-26-

please ignore that.[86]

Later in the cross-examination, defense counsel asked Burton whether his handwritten notes contained specific statements that Burton attributed to Brown in the 302. The government objected, and the court upheld the objection, instructing counsel to "[s]tick to the 302."[87]

Brown contends that both the district court's refusal to allow the defense to examine Burton on the contents of his notes and the district court's instruction violated Brown's rights under the Confrontation Clause of the Sixth Amendment. Brown maintains that the district court, by vouching for the accuracy of the 302, went beyond instructing the jury, as he requested it to do, that Brown did not have access to the notes. Brown also argues that the court's curative instruction was inadequate to remove the "taint" of its earlier instruction.

The Sixth Amendment of the United States Constitution guarantees criminal defendants "the right . . . to be confronted with the witnesses against him." This right is intended "to secure for the opponent the opportunity of cross-examination."[88]

Based on our review of the record, we are satisfied that the district court's limitation of Burton's testimony and its

---

[86] R. at 1625.

[87] R. at 1651-52.

[88] Davis v. Alaska, 415 U.S. 308, 315-16 (1974) (emphasis omitted from original) (internal quotations omitted).

-27-

instruction as to the whereabouts of the notes did not violate Brown's Sixth Amendment rights. First, the district court allowed Brown substantial leeway in questioning Burton on his note-taking procedures and report preparation. As the district court pointed out in its January 2001 post-trial order, Brown was able to impeach Burton's ability to record interviews accurately by disparaging Burton's command over articles (such as "an" versus "the") and his ability to write things down and copy things correctly.[89] In addition, we conclude that the district court's instruction accurately described the disclosure process, as Brown requested, and did not improperly vouch for the accuracy of the 302. Even assuming, arguendo, that the instruction stated more than simply where the notes were, but also whether they supported the 302, the court's curative instruction adequately cured any defect in the original instruction. For these reasons, we hold that the district court did not abuse its discretion in limiting Burton's testimony or in instructing the jury on the whereabouts of Burton's notes.

IV.

Brown next asserts that the district court abused its discretion by excluding the testimony of C.J. Blache, a witness that the defense hoped would impeach Agent Burton's ability to produce accurate 302 reports. We review the district court's

---

[89]    R. at 2456-58.

exclusion of evidence under an abuse of discretion standard.[90]

The defense argues that Blache would have testified that another FBI agent, Karen Gardner, prepared a 302 report in an earlier prosecution that had a number of errors in it. Agent Gardner prepared the report from her notes, and Agent Burton signed it. The defense maintains that Blache's testimony would have supported its theory that Burton does not prepare accurate 302 reports.

As an initial matter, we briefly address the government's position that Brown did not properly preserve this issue for appeal because he did not present the district court with a written proffer of Blache's testimony. Federal Rule of Evidence 103(a)-(a)(2) provides that:

> [e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and . . . [i]n case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked.[91]

An oral proffer may be sufficient to preserve an error for appellate review.[92]

Based on our review of the record, we find that the defense counsel provided the court with an adequate oral description of

---

[90]    See Carson v. Polley, 689 F.2d 562, 572 (5th Cir. 1982).

[91]    Fed. R. Evid. 103(a)-(a)(2).

[92]    See United States v. Gonzalez, 700 F.2d 196, 201 (5th Cir. 1983).

Blache's testimony. The district court definitively excluded the testimony before counsel stated he would submit a written proffer.[93] As the Advisory Committee Notes to Rule 103 make clear, "[w]hen the ruling is definitive, a renewed objection or offer of proof at the time the evidence is to be offered is more a formalism than a necessity." Accordingly, this issue is properly before us on appeal.

Turning to the merits, Blache's testimony would have tended to establish that Gardner prepared an inaccurate 302 in an earlier, related case. Agent Burton did not author the report, and his notes were not used in its preparation. Burton, a back-up agent for purposes of that interview, signed the report after Gardner prepared it from her notes. The district court did not abuse its discretion in excluding Blache's testimony as irrelevant to the issue of how carefully Burton takes notes and then uses those notes to prepare 302 reports.

V.

Brown next maintains that the government produced insufficient evidence to support his conviction for making a false statement under Count 51 of the indictment. Specifically, Brown argues that the prosecution failed to establish that his statement, even assuming it was false, was material to any decision of the FBI. In reviewing the sufficiency of the

---

[93] R. at 33-34.

evidence, this court must determine "whether a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt."[94]

As the Supreme Court explained in United States v. Gaudin,[95] "'materiality' is an element of the offense that the Government must prove." To be "material," the statement must have "a natural tendency to influence, or [be] capable of influencing, the decision of the decision-making body to which it was addressed."[96] A conviction under 18 U.S.C. § 1001 must be reversed if the evidence does not support a finding of materiality beyond a reasonable doubt, even if it does establish the falsity of the statement made.[97]

Count 51 of the indictment charges that "BROWN falsely stated that he met with EDWARDS at EDWARDS' office but the conversations only related to political matters . . . . In fact, BROWN specifically discussed strategical issues involving David Disiere and the Cascade Estate."[98] Brown argues that this Count charges him with lying about talking with Edwards about Cascade in Edwards' office only and that there was insufficient proof at

---

[94] United States v. Davis, 752 F.2d 963, 968 (5th Cir. 1985) (internal quotations omitted).

[95] 515 U.S. 506, 509 (1995).

[96] Id. (internal citation omitted).

[97] See id. at 511.

[98] Ind. at 46.

trial to establish why the location of this conversation was material to the FBI's investigation.

The district court rejected Brown's interpretation of Count 51 in its January 2001 post-trial order. The court explained that:

> the Court cannot accept Mr. Brown's contention that the focus of Agent Burton's question was <u>not</u> whether Mr. Brown had <u>that particular</u> long and involved conversation regarding Cascade but rather whether "such a conversation took place <u>in Edwards' office</u>. In light of the tape recording and Burton's and Brown's testimony, the jury readily could have found that Mr. Brown attempted to distance himself from this particular conversation, which reflected a detailed, personal knowledge of, and involvement in, the Cascade matter. . . . [T]here was sufficient evidence for the jury to conclude that Brown had intentionally lied in order to 'influence . . . the . . . decision[s] of Agent Burton by distancing himself from this particular conversation, which, by its detail, could have given investigators reason to believe that he was a significant actor in a series of events under criminal investigation.[99]

We agree with the district court that the jury was entitled to conclude that the focus of Agent Burton's question was not on the location of Brown and Edwards but on whether a particular conversation, identified by its time and location, took place. Once the jury viewed the question in this light, the falsity of the answer was obviously material to the investigation for the reasons that the district court explained. Therefore, we hold that there is sufficient evidence to support Brown's conviction on Count 51.

VI.

---

[99] R. at 2468-69 (emphasis in original).

Brown also contends that the district court abused its discretion in ordering an anonymous jury. We review the district court's decision to empanel an anonymous jury for abuse of discretion.[100]

This circuit first addressed the issue of anonymous jury empanelment in United States v. Krout.[101] In Krout, this court held that an anonymous jury is constitutional "when there is strong reason to believe the jury needs protection and the district court takes reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected."[102] This court then identified several factors that may justify use of an anonymous jury:

> (1)the defendants' involvement in organized crime; (2) the defendants' participation in a group with the capacity to harm jurors; (3) the defendants' past attempts to interfere with the judicial process or witnesses; (4) the potential that, if convicted, the defendants will suffer a lengthy incarceration and substantial monetary penalties; and, (5) extensive publicity that could enhance the possibility that jurors' names would become public and expose them to intimidation and harassment.[103]

None of these factors is dispositive; rather, the decision to empanel an anonymous jury should be made on the totality of the

---

[100]    See United States v. Salvatore, 110 F.3d 1131, 1143 (5th Cir. 1997).

[101]    66 F.3d 1420, 1426-28 (5th Cir. 1995).

[102]    Id. at 1427 (quoting United States v. Wong, 40 F.3d 1347, 1376 (2d Cir. 1994) (internal quotation marks omitted).

[103]    Id.

circumstances.[104]

In this case, the district court ordered an anonymous jury in its August 10, 2000 order.  The district court found that three of the five Krout factors were present in this case.[105] First, the court found that "several individuals in the case at bar have already proven their ability to corrupt the legal system."[106]  The court noted that two co-conspirators indicted with Brown plead guilty to witness tampering in connection with the Cascade lawsuit.[107]  These facts, among others, the court explained, raise concern that the defendants would attempt to interfere with the judicial process or witnesses.[108]  Second, the court observed that the defendants, if convicted, faced lengthy sentences and massive fines.[109]  Finally, the court explained the "enormous local and national publicity surrounding the case" against a former state governor and the then-current Insurance Commissioner militated in favor of ordering an anonymous jury.[110] The court therefore ordered that the names, addresses, and places

---

[104]   See United States v. Branch, 91 F.3d 699, 724 (5th Cir. 1996).

[105]   R. at 1759–63.

[106]   R. at 1761.

[107]   R. at 1760–61.

[108]   R. at 1760–61.

[109]   R. at 1760.

[110]   R. at 1760.

of employment of the jurors be withheld. The court provided the defendants with substantial information about the jurors "through an extensive voir dire and an exhaustive 42-page juror questionnaire."[111]

In light of the unique circumstances of this case, the district court reasonably concluded that three of the Krout factors discussed above were present in this case.[112] Furthermore, the court's efforts to provide the defendants with sufficient information on the jurors through extensive juror questionnaires and voir dire adequately protected the defendants' rights and permitted them to select a jury intelligently.

---

[111]    R. at 1762.

[112]    The district court's reasoning with respect to the presence of the fifth Krout factor is consistent with this court's decision in United States v. Brown. 218 F.3d 415, 429 (5th Cir. 2000). In that opinion, this court upheld the constitutionality of the gag order that the district court placed on the parties and lawyers in this case. Id. A panel of this court reasoned that:
> [t]he enormous local and national publicity surrounding the cases, the presence of three related trials, which created a heightened and somewhat unique danger of tainting any one of the three juries, as well as the parties' self-proclaimed willingness to use the press for their full advantage, justified the district court's conclusion that there was at least a 'substantial likelihood' that allowing further extra-judicial statements by the parties would materially prejudice the court's ability to conduct a fair trial.
Id.
    In another ruling by this court in the present case, United States v. Brown, 250 F.3d 907, 922 (5th Cir. 2000), this court struck down as unconstitutional a portion of the district court's August 9, 2000 order forbidding the press to research independently the identity of the jurors in this trial. However, the substantive merits of the anonymous jury order were not at issue in that case. Id.

Therefore, we conclude that the district court did not abuse its discretion in ordering an anonymous jury.

## VII.

Finally, Brown argues that the wiretap evidence obtained from Edwards' home and office was unlawful. The evidence upon which the government relied at trial to prove the falsity of Brown's statements consisted primarily of taped conversations between Brown and Edwards that were obtained through electronic surveillance of Edwards' home and office. Judge John Parker authorized this surveillance in October and December 1996, respectively.

At trial, the defendants jointly moved to suppress the fruits of the surveillance on the grounds that (1) there was no probable cause to support the warrants under Title III; and (2) the government failed to minimize interceptions as required by 18 U.S.C. § 2515. In September 2000, the district court denied the motion, basing its decision in part upon an earlier ruling by Judge Polozola. Brown now raises on appeal the same objections to the admissibility of the tapes.

## A.

Brown's first argument is that insufficient evidence was presented in the warrant affidavit submitted to Judge Parker to support the issuance of the warrants to wiretap Edwards' home and office. Brown asserts that the affidavits submitted to Judge

Parker were based on information provided by an informant that the government knew to be untrustworthy and on conjectural interpretations of taped conversations. Brown maintains that, at the very least, he was entitled to a hearing to assess the basis of these warrants under Franks v. Delaware.[113]

Two panels of this court have recently resolved this issue in United States v. Brown[114] and United States v. Edwards.[115] In those cases, this court upheld the same warrants at issue here. In accordance with Edwards and Brown, we hold that there was probable cause to sustain the issuance of the warrants.

B.

Brown next contends that the government violated its statutory obligation under 18 U.S.C. § 2515 to minimize unrelated interceptions. This issue is unique to the present appeal. This court reviews the district court's determination of the reasonableness of minimization efforts for clear error.[116]

A brief overview of the FBI's investigation of Edwin Edwards is necessary to evaluate Brown's minimization claims. The government sought permission to tap Edwards' phones based on

---

[113] 438 U.S. 154, 171-72 (1978).

[114] No. 01-30771, 2002 U.S. App. LEXIS 14188, at *4-28 (5th Cir. Aug. 9, 2002).

[115] __ F.3d __ (5th Cir. August 23, 2002).

[116] See United States v. Wilson, 77 F.3d 105, 112 (5th Cir. 1996).

allegations of bribery.  One allegation was that Edwards was receiving pay-offs from Texas businessmen who wanted to build and operate a juvenile detention facility in Jena, Louisiana.  The named interceptees in connection with this alleged scheme were Edwards, Cecil Brown, Kenneth Pitre, and Richard Stalder (then Secretary of Louisiana's Department of Corrections).  Another allegation was that Edwards had received bribes from other Texas businessmen who sought approval to develop waste disposal sites in Louisiana.  Edwards, Cecil Brown, and Guy Thompson, an owner of a Texas business under investigation, were named as interceptees.  A few days after the government initiated its electronic surveillance of Edwards' home telephone, the government intercepted the first of several calls related to the Cascade matter.[117]

Federal law "requir[es] electronic surveillance to 'be conducted in such a way as to minimize the interception of communications not otherwise subject to interception.'"[118]  The government's efforts to minimize interception of non-pertinent

---

[117]  The government began electronic surveillance of Edwards' home telephone on October 18, 1996.  The government intercepted the first Cascade-related calls on October 21, 1996.  On December 17, 1996, Judge Parker granted the government's application for extension of the October 1996 warrant order to authorize interception of Cascade-related conversations.  The extension application specifically named Brown as an interceptee.  R. at 2139.

[118]  United States v. Bankston, 182 F.3d 296, 307 (5th Cir. 1999) (quoting 18 U.S.C. § 2518(5)), rev'd on other grounds, 531 U.S. 12 (2000).

conversations "must be 'objectively reasonable' in light of the circumstances confronting the interceptor."[119]  This court has set forth a three-part test to determine whether the government's minimization efforts meet this standard: "(1) the nature and scope of the criminal enterprise under investigation; (2) the Government's reasonable inferences of the character of a conversation from the parties to it; and (3) the extent of judicial supervision."[120]

Although 18 U.S.C. § 2515 requires minimization, it does not "require[] government agents to avoid intercepting all nonrelevant conversations when conducting a wiretap investigation."[121]  On the contrary, the practical necessities of conducting a wiretap may, in some circumstances, inevitably lead to the interception of some conversations outside the scope of the wiretap order:

> [T]he only feasible approach to minimization is the gradual
> development, during the execution of a particular wiretap
> order, of categories of calls which most likely will not
> produce information relevant to the investigation. . . .
> Until such categories become reasonably apparent, however,
> interception of all calls will be justified under the
> wiretap authorization.[122]

---

[119]    Id.

[120]    Id. (citing United States v. Hyde, 574 F.2d 856, 869 (5th Cir. 1978)) (internal quotation marks omitted).

[121]    Id. (internal citations omitted).

[122]    United States v. Hyde, 574 F.2d 856, 870 (5th Cir. 1978) (quoting United States v. Scott, 516 F.2d 751, 754-55 (D.C. Cir. 1975)).

Accordingly, the government may reasonably intercept more calls during the initial phase of an investigation, when the precise scope of and participants in the criminal scheme have not yet been identified.[123] This consideration is especially strong where the criminal enterprise under investigation is a large and sophisticated conspiracy, and the purpose of the intercept order is to learn the identities of conspirators and define the reach of the conspiracy.[124]

The district court rejected Brown's motion to suppress the wiretap evidence in its September 29, 2000 order. The court found that it was "reasonable to believe that the Government had yet to gather a complete picture of the Jena Prison and Evergreen Waste Disposal schemes at the time of the Edwards' home wiretap."[125] It further reasoned that "there was probable cause to believe that a wiretap on Edwards' phone would reveal the presence of additional, previously unknown conspirators to and dimensions of the scheme."[126] The district court also noted that

_____

[123] See United States v. Kahn, 415 U.S. 143 (1974) (approving an order authorizing interception of pertinent conversations between a named target and "others as yet unknown"); Hyde, 574 F.2d at 862, 869-70 ("One of the objects of wiretapping is to ascertain the full extent of participation in criminal activity, and we need not limit retrospectively the pool of potential defendants.").

[124] See Hyde, 574 F.2d at 869 ("Large and sophisticated conspiracies may justify more electronic surveillance than a single criminal act.").

[125] R. at 2142.

[126] R. at 2142.

Judge Parker received ten-day reports, updating the information received from the intercepted calls.[127]

Based on our review of the record, we conclude that the district court did not clearly err in finding that the government did not have a "complete picture" of the participants in or scope of the prison and waste disposal conspiracies it was investigating when it intercepted the Cascade-related phone calls. The government's October 1996 wiretap application indicates that the government believed that it still had much to learn about the alleged schemes. The government requested wiretap authorization in order to intercept communications "that reveal the manner in which Edwards, [Cecil] Brown, Stalder, Pitre, Thompson, and other persons yet unknown and unidentified, participate in the specified offenses, and that reveal the identities of their co-conspirators, their places of operation, and the nature of the conspiracy involved therein . . . ."[128] The summaries of the Confidential Witness tapes and the Cecil Brown wiretap in the Affidavit show that these sources offered the government only a snapshot of the dimensions of and participants in the prison and waste disposal schemes.[129] Contrary to Brown's position, the fact that the intercepted Cascade-related calls

---

[127]   R. at 2140.

[128]   Application Oct. 1, 1996, at 5.

[129]   See R. at 2142.

-41-

involved the state Insurance Commissioner does not facially make their interception objectively unreasonable.  On the contrary, the FBI's investigation targeted some of Louisiana's top public officials to determine their involvement in a broad scheme of public corruption whose parameters were not then fully defined.

In addition, the record reveals that the government minimized interception of numerous conversations.  The Daily Intercept Reports show that, as the surveillance progressed, the government minimized a greater percentage of calls, in keeping with the approach approved in United States v. Hyde.[130]  Moreover, many of the intercepted calls about which Brown complains were short, making minimization difficult.[131]

Finally, as the district court noted, Judge Parker received reports on the investigation every ten days, in which he was informed that the government was intercepting communications involving Brown, Sanders, and Weems, among others.[132]  In fact, the very first of these reports listed Brown and Judge Sanders as people whose calls the government had intercepted.[133]  In light of

---

[130]   574 F.2d 856, 870 (5th Cir. 1978); see R. at 2140.  This fact alone is not determinative, however. See   Scott v. United States, 436 U.S. 128, 140 (1978) (explaining that the use of percentages may provide assistance in determining whether the government's minimization was reasonable, but that "blind reliance" on statistics is not a "sure guide to a correct answer").

[131]   See R. at 2140.

[132]   See R. at 2139-40.

[133]   See R. at 728, 2139.

these factors, the district court did not clearly err in finding that the government's interception of the Cascade-related calls was objectively reasonable.  Therefore, we affirm the district court's denial of Brown's motion to suppress the fruits of the wiretap.

## VIII.

For the reasons stated above, Brown's convictions on all counts are hereby AFFIRMED.


AFFIRMED.